[No. H034764. Sixth Dist. Feb. 28, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL SCOTT, Defendant and Appellant.

1304

## COUNSEL

Vicki I. Firstman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—Penal Code section 1202.05 (section 1202.05) provides that whenever a defendant is sentenced to prison for a qualifying crime against a minor, the sentencing court must prohibit prison visitation between the defendant and his "child victim." In sentencing defendant Michael Scott to prison for sexually abusing two minor females, the court below applied section 1202.05 to prohibit visitation with both victims, although one of them—his daughter, A.S.—was over the age of 18 at the time of sentencing. Defendant contends that this was error and that the court further erred to the extent that it prohibited "contact" between defendant and A.S. We sustain this contention. The danger addressed by section 1202.05 is that children's caregivers, operating in a state of ignorance or denial, sometimes subject their charges to injurious encounters with their imprisoned abusers. This danger disappears when the victim is no longer subject to the control of his or her parents or guardians. We will also hold that these issues may and should be addressed despite the absence of an objection in the trial court, and that nothing in this record permitted the court to make an order prohibiting all communication between defendant and his daughter. We will direct a modification of the judgment to strike any restriction on visitation or communication between defendant and A.S., and will affirm the judgment as so modified.

### BACKGROUND

Defendant was charged by amended information with eight counts sounding in child sexual abuse. The first two counts charged lewd and lascivious acts in 2008 upon M.M., a child of 11, in violation of Penal Code section 288, subdivision (a). The next six counts charged the same offense against defendant's daughter A.S., between 2003 and 2005, when she was 12 or 13 years old. The ninth and 10th counts alleged more recent acts against A.S., i.e., unlawful penetration (Pen. Code, § 289, subd. (a)(1)) and oral copulation (*id.*, § 288a, subd. (c)(2)). It was further alleged that by virtue of having committed the charged offenses against multiple victims, defendant was subject to a sentence of 15 years to life on each count. (Pen. Code, § 667.61, subds. (b), (e).)

Defendant entered negotiated pleas to all charges, with the understanding that he would be sentenced to prison for 30 years to life. By the time the probation report was prepared, A.S. was 18, whereas M.M. was 12. The report included a recommendation that "[t]he Court issue an order prohibiting visitation between the defendant and the child victim(s) pursuant to Section 1202.05 of the Penal Code."

At the first of two sentencing hearings, the court stated among other things that it was "renew[ing]" a "protective order" that had "already been . . . filed and served." Without identifying any specific "protected person," the court proceeded to admonish defendant that he "must have no personal contact, telephonic, or written contact with the protected person," "must have no contact with the protected person through a third party except an attorney of record," and "must not come within 300 yards of the protected person." The court also stated an intention to "issue an order prohibiting any visitation between you and the victim." Although the court again neglected to specify the victim to whom this order would apply, it issued a written notice, naming only M.M., as a person as to whom it had made an order under section 1202.05 "prohibiting all visitation between defendant and the minor victim(s)."

About two months later, the court recalled the sentence under Penal Code section 1170, subdivision (d), for the stated purpose of modifying certain charges and assessments as well as "correct[ing] the protective order, which did not need to be issued." During its initial pronouncement of sentence the court said, "I will now issue an order prohibiting any visitation between you and the child victim pursuant to Section 1202.05 of the Penal Code." Shortly thereafter the prosecutor stated, "[J]ust to clarify because you used the singular term, is it actually the Court's intention that both victims listed in the Complaint and Information be prohibited?" The court replied, "I used singular because one is an adult and one is a child, but if you would like, both are

included." The prosecutor said, "I would," whereupon the court said, "Then the Court order prohibiting visitation between the defendant and the victim includes both victims, and that is pursuant to Penal Code Section 1202.05." The record does not contain a second formal order prohibiting visitation, but the abstract of judgment includes, among "other orders," the statement, "No contact with victim PC1202.05." A similar entry appears in the form minute order memorializing the sentence.

Defendant filed this timely appeal.

DISCUSSION

## I. Availability of Objection on Appeal

The chief question before us is whether the trial court erred in making an order prohibiting visitation between defendant and his adult daughter. A second question is whether the court could, on the present record, issue an order prohibiting defendant from "contact[ing]" her. Before reaching these questions we must consider respondent's contention that defendant has forfeited the right to appellate review of these directives.

It is undisputed that defendant failed to object to the orders he now challenges. And it is of course a familiar rule that appellate courts will not review errors to which an objection could have been, but was not, made in the trial court. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 400, p. 458.) The application of this rule to sentencing error is governed by *People v. Scott* (1994) 9 Cal.4th 331, 351–352 [36 Cal.Rptr.2d 627, 885 P.2d 1040] (*Scott*), and its progeny. That decision holds that while a trial court objection is generally necessary to preserve a claim of sentencing error for appeal, a "narrow exception" exists when the trial court has imposed an " 'unauthorized sentence.' " (*Id.* at p. 354.) A challenged sentence falls within this exception when it "could not lawfully be imposed under any circumstance in the particular case," such that it is " 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*Ibid.*, quoting *People v. Welch* (1993) 5 Cal.4th 228, 235 [19 Cal.Rptr.2d 520, 851 P.2d 802].) In contrast, "claims deemed waived on appeal involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner." (*Scott, supra*, 9 Cal.4th at p. 354.)

Defendant contends that the trial court had no power to make a no-visitation order as to a victim, like A.S., who was an adult at the time of sentencing. If this contention is correct, then the order barring visitation was, as to her, "unauthorized" for present purposes. Respondent appears to contend, however, that the order was not a "sentence." Respondent first quotes

selectively from *Scott, supra*, 9 Cal.4th at page 354, to imply that a challenge only concerns an unauthorized sentence if it " 'violates mandatory provisions governing the length of confinement.' " Obviously the order here did not affect the length of defendant's confinement. But what the court actually said in *Scott* is that "legal error resulting in an unauthorized sentence *commonly occurs* where the court violates mandatory provisions governing the length of confinement." (*Ibid.*, fn. omitted, italics added.) The court did not suggest that an order must fit this description to constitute an unauthorized sentence, but merely gave it as a "common" example of such a sentence. This court and others have frequently held that directives not affecting the length of confinement fell within the "unauthorized sentence" rubric so as not to be forfeited under *Scott*. (E.g., *People v. Rowland* (1988) 206 Cal.App.3d 119, 126 [253 Cal.Rptr. 190] [restitution fine]; *People v. Terrell* (1999) 69 Cal.App.4th 1246, 1255 [82 Cal.Rptr.2d 231] [failure to impose mandatory parole restitution fine]; *People v. Fond* (1999) 71 Cal.App.4th 127, 134 [83 Cal.Rptr.2d 660] [same].)

Respondent cites *People v. Stowell* (2003) 31 Cal.4th 1107, 1113 [6 Cal.Rptr.3d 723, 79 P.3d 1030] (*Stowell*) for the proposition that "orders accompanying sentences that are not punishment are not unauthorized." This is apparently meant to suggest that an order can only come within *Scott's* exception for unauthorized sentences if it constitutes "punishment" in its own right. The no-visit order fails this test, respondent asserts, because its purpose is not to punish defendant but to protect his victims from the emotional trauma of further contact with him.

We reject the premise that a sentencing directive cannot be viewed as an unauthorized sentence unless its purpose is punitive. The question in *Stowell* was whether the defendant could challenge on appeal the trial court's failure to record a finding of probable cause for an AIDS testing order, as required by the governing statute. Although such an error seems clearly subject to forfeiture under *Scott* as "procedurally . . . flawed" (*Scott, supra*, 9 Cal.4th at p. 354), the Supreme Court declined to employ *Scott's* classification scheme, invoking instead what it called "the general forfeiture rationale" to hold the objection lost. (*Stowell, supra*, 31 Cal.4th at p. 1113.) In the passage cited here by respondent, the court observed that "HIV testing does not constitute punishment" and therefore "cannot properly be considered a sentencing choice." (*Ibid.*) While this language indeed hints at an argument such as respondent's, we doubt that the Supreme Court would have us read the case in that manner. The cited remarks are so oblique as barely to rise even to the level of dictum. The court did not explain their relevance to its

conclusion, or make them part of anything resembling a syllogistic exposition.[1] Indeed the ratio decidendi of the case is far from apparent. After the remarks cited by respondent, the court used similarly indirect language to suggest that an objection might be forfeited, notwithstanding the unauthorized sentence exception, whenever it could have been "easily remedied upon timely objection." (*Stowell*, at p. 1114.) Of course this characterization might apply to even the most serious excesses of jurisdiction. And like the court's oblique comments about punishment, it has never ripened into a rule.[2] Similarly, the court observed that "such procedural defects" as the error challenged there "do not implicate any fundamental or constitutional right that might excuse the failure to object." (*Stowell, supra,* 31 Cal.4th at p. 1114.) But it was not then the rule, and has not become the rule, that a sentence must offend a "fundamental or constitutional right" before it can be held "unauthorized" for purposes of the rule in *Scott*.

██ In any event, if we accepted respondent's reading of *Stowell* it would only bring the present case within "the general forfeiture rationale." (*Stowell, supra,* 31 Cal.4th at p. 1113 (conc. opn. of Baxter, J.).) We take this phrase to mean the rules generally governing appellate cognizance of objections not raised in the trial court. Under those principles every appellate court has the discretionary power to entertain an objection first raised on appeal. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, 162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429] [an appellate court is "generally not prohibited from reaching a question that has not been preserved for review"; whether to do so "is entrusted to its discretion"]; *Air Machine Com SRL v. Superior Court* (2010) 186 Cal.App.4th 414, 421, fn. 7 [112 Cal.Rptr.3d 482] [" 'Although appellate courts ordinarily will not consider a matter raised for the first time on appeal, whether to apply that rule is largely a question of the appellate court's discretion.' "].) This is particularly true where the issues raised "involve only questions of law based on undisputed facts." (*People v. Rosas* (2010) 191 Cal.App.4th 107, 115 [119 Cal.Rptr.3d 74].)

---

[1] The failure to clarify the meaning of the court's remarks about punitive intent is all the more puzzling in light of Justice Baxter's separate concurrence, which cogently criticized those remarks and expressed the fear that they would "introduce needless uncertainty into this area of the law." (*Stowell, supra,* 31 Cal.4th at p. 1117 (conc. opn. of Baxter, J.).) Respondent's argument, if accepted, would bear out that fear.

[2] Only one published decision has applied *Stowell* in the manner respondent urges. In *People v. McCray* (2006) 144 Cal.App.4th 258, 263 [50 Cal.Rptr.3d 343], the court relied on *Stowell* to hold that an order requiring a defendant to furnish a DNA sample could not be viewed as an unauthorized sentence for purposes of a claim of facial unconstitutionality because the sample requirement "was not intended as punishment" but instead "was enacted as a law enforcement tool . . . ." But if the facial challenge there fell outside the *Scott* regime, it fitted squarely within the rule that a constitutional or other objection to a statute can be raised for the first time on appeal if it presents only questions of law. (See, e.g., *In re P.C.* (2006) 137 Cal.App.4th 279, 287 [40 Cal.Rptr.3d 17]; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1373, fn. 8 [105 Cal.Rptr.3d 521].)

Here, assuming the asserted error is not an "unauthorized sentence" for purposes of the *Scott* rule, it involves "pure questions of law" (*People v. Welch, supra,* 5 Cal.4th 228, 235), and is " 'clear and correctable' independent of any factual issues presented by the record at sentencing" (*Scott, supra,* 9 Cal.4th at p. 354). It also concerns a matter apparently of first impression, and implicates interests that may not be readily vindicated by any other judicial process, particularly insofar as respondent's reading of the statute would erect a barrier to communication between some adult victims of crime and their abusers which the former may not invariably welcome, and which are not imposed on other adult victims of crime. We will therefore exercise our discretion to entertain the objection on the merits.

We also observe that this appeal is partly concerned with the trial court's written orders prohibiting "contact" between defendant and one or both of his victims. As to those orders defendant had no opportunity to object in the trial court. Nothing was said about "contact" at the second and final sentencing hearing. The closest the court came to mentioning the subject was to say that the "protective order" it had previously made "did not need to be issued." The no-contact order thus falls outside any rational rule of appellate forfeiture. The propriety of that order cannot be determined without addressing most or all of the issues implicated by the challenge to the no-visitation order. It would therefore be an absurd exaltation of form to entertain the objection to the no-contact order while refusing to consider the propriety of the no-visitation order.

We turn to the substantive questions presented.

## II. *No-visitation Order*

### A. *Introduction*

Section 1202.05 requires a sentencing court to prohibit visitation between a defendant and his "child victim" if the defendant is convicted of an offense involving sexual abuse of a child "and the victim . . . is a child under the age of 18 years." (§ 1202.05, subd. (a).) One way of posing the question before us is what did the Legislature mean when it referred to a "child victim"—one who *was* a child when the crime was committed, or one who *is* a child at the time of sentencing?

We have written that when faced with questions of statutory meaning, "we must ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citation.] To determine the Legislature's intent, we first examine the words of the statute in context, giving them if possible their plain, everyday, commonsense meaning. If we find no ambiguity or uncertainty, we

presume that the Legislature meant what it said, rendering further inquiry into legislative intent unnecessary. [Citation.] If, on the other hand, the statutory language is unclear or ambiguous, i.e., it permits more than one reasonable interpretation, we may consider various extrinsic aids to help us ascertain the Legislature's intent, including legislative history, public policy, settled rules of statutory construction, and an examination of the evils to be remedied and the legislative scheme encompassing the statute in question. [Citations.] In such circumstances, we select the interpretation that comports most closely with the apparent intent of the Legislature, with a view toward promoting, rather than defeating, the general purpose of the statute and avoiding an interpretation that would lead to absurd consequences. [Citation.] We also attempt to give effect to every word in a statute and avoid constructions that render statutory terms superfluous or meaningless. [Citation.]" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 749 [69 Cal.Rptr.3d 365].)

As will appear, each step of this inquiry reveals that the statute was not intended to affect visitation between state prisoners and victims who are adults at the time of the contemplated visitation.

### B. *Language of the Statute*

█ The plainest, most commonsense meaning of the language chosen by the Legislature is that it was intended to affect only victims who were under the age of 18 at the time of sentencing or, more precisely, at the time of a contemplated visit with a state prison inmate. Section 1202.05, subdivision (a), calls for a prohibition upon visitation "[w]henever a person is sentenced" for a qualifying offense "and the victim . . . is a child."[3] (§ 1202.05, subd. (a).) The most germane feature of this language, for present purposes, is the use of the present tense, as of the time of sentencing, in

---

[3] In its entirety section 1202.05 provides, "(a) Whenever a person is sentenced to the state prison on or after January 1, 1993, for violating Section 261, 264.1, 266c, 285, 286, 288, 288a, 288.5, or 289, and the victim of one or more of those offenses is a child under the age of 18 years, the court shall prohibit all visitation between the defendant and the child victim. The court's order shall be transmitted to the Department of Corrections, to the parents, adoptive parents, or guardians, or a combination thereof, of the child victim, and to the child victim. If any parent, adoptive parent, or legal guardian of the child victim, or the child victim objects to the court's order, he or she may request a hearing on the matter. Any request for a hearing on the matter filed with the sentencing court shall be referred to the appropriate juvenile court pursuant to Section 362.6 of the Welfare and Institutions Code.

"(b) The Department of Corrections is authorized to notify the sentencing court of persons who were sentenced to the state prison prior to January 1, 1993, for violating Section 261, 264.1, 266c, 285, 286, 288, 288a, 288.5, or 289, when the victim of one or more of those offenses was a child under the age of 18 years.

"Upon notification by the department pursuant to this subdivision, the sentencing court shall prohibit all visitation between the defendant and the child victim, according to the procedures specified in subdivision (a)."

describing the victim's minority as a condition for the statute's operation. In ordinary usage this language contemplates a victim who "is" a child "[w]hen[]" the defendant is sentenced. Moreover if the statute was intended to apply to all victims of child sexual abuse, regardless of current age, the modifier "child" in the phrase "child victim" could be dispensed with simply by introducing the condition that the victim *was* a child when the crime occurred, after which the term "victim" would amply convey the intended meaning, and indeed would eliminate the ambiguity inhering in "child victim."

Yet the phrase "child victim" appears six times in section 1202.05, and nearly two dozen times in the act of which it is a part. The common meaning of this phrase, in isolation, is a person who is both a victim and a child at the time the description is applied.[4]

■ Respondent offers no coherent argument for a contrary reading. Its chief strategy is to simply ignore the textual clues noted above while insisting that "[t]here is nothing in the language of section 1202.05 . . . that requires the victim of the specified crimes to be under the age of 18 at the time of sentencing." (Italics omitted.) Such support as it offers for its own reading depends on emphasizing some words while disregarding others, e.g., italicizing "victim" while ignoring "child."[5] But we must eschew a reading that "selectively emphasizes favorable statutory language in isolation without attempting to fit the language into a coherent reading" of the larger statutory scheme. (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 941 [20 Cal.Rptr.3d 485].) Respondent's contrary approach transgresses the constructional imperative that the Legislature be presumed to have "intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469,

---

[4] The term "child victim" could theoretically refer not to the victim's age, but to a filial relationship between the victim and the defendant. Such a reading would be wholly unsupported by the legislative history. Perhaps more importantly, it would produce facially absurd results. Under such a proscription visitation would be permitted between a defendant and any minor he had abused *other* than his own offspring. Here, it would prohibit visitation with defendant's adult daughter, while allowing visitation with the minor victim M.M. Respondent rightly refrains from putting forward such a reading.

[5] Respondent writes, "[T]he plain language of the statute prohibits visitation where 'the *victim*, of one or more of those offense is a child under the age of 18 years.' The statute also repeatedly refers to the 'child *victim*.' " (Original italics.) Similarly, in a letter brief addressing the legislative history, respondent writes, "There is nothing ambiguous or unclear about this provision. The plain language of the statute prohibits visitation where 'the *victim* of one or more of those offenses is a child under the age of 18 years.' The statute repeatedly refers to the 'child *victim*.' . . . [Defendant] clearly committed the offense against a *child victim.* Under the plain and unambiguous language of section 1202.05, the trial court was required to prohibit all visitation between appellant and the victim." (Original italics.)

476 [66 Cal.Rptr.2d 319, 940 P.2d 906], quoting *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].)

Even if respondent's interpretation of the statute appeared otherwise colorable, it would at most raise an ambiguity. To resolve that ambiguity we would turn, as we now do, to the remaining steps of the interpretational inquiry described above.

### C. *The 1992 Act*

Section 1202.05 was adopted in 1992 as part of an act entitled "Inmates: restriction of access to child victims." (Stats. 1992, ch. 1008, § 1 et seq., p. 4705 (the 1992 Act).) The act consists of four sections. The first is an uncodified declaration of legislative purpose.[6] (Stats. 1992, ch. 1008, § 1, p. 4705.) It describes two statutory objectives. The narrower of the two is to facilitate "mental health treatment" addressing the "long-term emotional and psychological damage" suffered by victims of child sexual abuse. (*Ibid.*) The declaration links this objective to public expenditures on "mental health treatment for *children* who have been sexually abused." (*Ibid.*, italics added.) The 1992 Act's broader purpose is "to protect *minor victims* of sexual abuse from further psychological or emotional damage resulting from *premature or counter-therapeutic contact* with their abusers . . . ." (*Ibid.*, italics added.) To avoid this harm, the Legislature declared, "there should be no visitation between the defendant incarcerated in state prison for child sexual abuse and the child victim *unless a juvenile court finds* that such visitation is in the best interests of the child victim." (*Ibid.*, italics added.)

■ As made clear by the last-quoted language, the statute is not intended to impose a *categorical* ban on visitation but only a *conditional* one, i.e., visitation is banned unless a juvenile court directs otherwise. Obviously the Legislature believed that visitation may at some point, and in some cases, be consistent with the victim's best interests. This belief pervades the operative sections of the 1992 Act. Thus section 1202.05 (*ante*, fn. 3.) mandates issuance of a no-visitation order, but authorizes "any parent, adoptive parent,

---

[6] "The Legislature has provided funds through the Victims of Crime Program, administered by the State Board of Control, to pay for mental health treatment for children who have been sexually abused in order that no child victim of sexual abuse would be denied access to therapy for financial reasons. The Legislature hereby finds that child sexual abuse results in long-term emotional and psychological damage to the child victim if left untreated. Accordingly, to protect minor victims of sexual abuse from further psychological or emotional damage resulting from premature or counter-therapeutic contact with their abusers who are inmates in the state prison, the Legislature declares that there should be no visitation between the defendant incarcerated in state prison for child sexual abuse and the child victim unless a juvenile court finds that such visitation is in the best interests of the child victim." (Stats. 1992, ch. 1008, § 1, p. 4705.)

or legal guardian of the child victim, or the child victim" to seek relief from that order. (§ 1202.05, subd. (a).) If relief is sought, the matter is to be "referred to the appropriate juvenile court" for determination. (*Ibid.*) Procedures governing such relief are set forth in Welfare and Institutions Code section 362.6 (§ 362.6), the last section of the 1992 Act.[7] (Stats. 1992, ch. 1008, § 4, p. 4706.) Most critically for our purposes, it permits modification of the no-visitation order "at any time prior to the child victim's 18th birthday," and declares that "the juvenile court shall retain jurisdiction over the matter until the child victim reaches the age of 18 years." (§ 362.6, subd. (d).)

The remaining section of the 1992 Act (Stats. 1992, ch. 1008, § 3, p. 4706) adds Penal Code section 5054.2, which defines the role of correctional authorities in carrying out the act.[8] It resembles section 1202.05 in referring to the victim's age in the present tense, i.e., visitation is forbidden "[w]henever a person *is* incarcerated in a state prison" and "the victim . . . *is* a child under the age of 18 years." (Pen. Code, § 5054.2.) The statute requires prison officials to "protect the interest of [the] child victim" in such cases "by prohibiting visitation . . . pursuant to Section 1202.05." (*Ibid.*) Visitation is only permitted "when the juvenile court, pursuant to Section 362.6 of the Welfare and Institutions Code, finds that visitation between the incarcerated person and his or her child victim is in the best interests of the child victim." (*Ibid.*)

---

[7] Section 362.6 provides, "(a) When a hearing is requested pursuant to Section 1202.05 of the Penal Code, the sentencing court shall forward a copy of the request to the child protective services agency (CPS), or the appropriate entity, in the county in which any related dependency matters as to the affected child victim have been heard or to the county in which the child victim resides. CPS, or the appropriate entity, shall initiate a hearing to determine whether visitation between the child victim and the incarcerated person would be in the best interests of the child victim. If the court determines that visitation with the incarcerated person is in the best interests of the child victim, CPS, or the appropriate entity, shall notify the Department of Corrections to provide for contact or visitation, or both, as ordered by the court.

"(b) The court, if visitation is allowed, may impose whatever safeguards or restrictions it deems appropriate to protect the child victim.

"(c) The court's order shall be transmitted to all parties and to the Department of Corrections.

"(d) Any party may return to the juvenile court at any time prior to the child victim's 18th birthday and request modification of the court's order based on a change of circumstances. For these purposes, the juvenile court shall retain jurisdiction over the matter until the child victim reaches the age of 18 years." (§ 362.6.)

[8] "Whenever a person is incarcerated in a state prison for violating Section 261, 264.1, 266c, 285, 286, 288, 288a, 288.5, or 289, and the victim of one or more of those offenses is a child under the age of 18 years, the Secretary of the Department of Corrections and Rehabilitation shall protect the interest of that child victim by prohibiting visitation between the incarcerated person and the child victim pursuant to Section 1202.05. The secretary shall allow visitation only when the juvenile court, pursuant to Section 362.6 of the Welfare and Institutions Code, finds that visitation between the incarcerated person and his or her child victim is in the best interests of the child victim." (Pen. Code, § 5054.2.)

This scheme is incompatible with respondent's reading of section 1202.05 in at least one unmistakable respect: While it explicitly recognizes that visitation in some cases may serve the best interests of the victim, it provides no means by which victims over the age of 18 may overcome the general prohibition on visitation. If a victim is an adult at the time of sentencing, or fails to secure relief from the order before reaching the age of majority, respondent's reading would forever preclude visitation with his or her former abuser. Neither the sentencing court nor correctional authorities are granted any discretion in the matter. The former must make the prohibitory order, and the latter must honor it, unless the juvenile court determines otherwise. But the juvenile court loses the power to make such a determination on the victim's 18th birthday. (Pen. Code, §§ 1202.05, subd. (a), 5054.2; Welf. & Inst. Code, § 362.6, subd. (d); Stats. 1992, ch. 1008, § 1, p. 4705.) Respondent's reading would thus produce a perpetual, irremediable bar to visitation between child abusers and their now-adult victims.

Such a result might be questioned on many grounds, but most of them are academic because the perpetual ban implicitly advocated by respondent simply cannot be reconciled with the legislative intent reflected in the act. A far more rational reading—the only one bringing all of the act's provisions into harmony—is that the Legislature did not intend the act to have *any* effect on adult victims of child abuse, i.e., that it intended "child victim" to mean only one who is a child at the time of a contemplated visit.

### D. *Statutory Purpose and Legislative History*

The foregoing conclusion acquires even greater force when viewed in light of the harm the 1992 Act was meant to address and the nature of the protection it was intended to afford. Respondent's arguments take it as a given that adult survivors of childhood sexual abuse are exposed to some danger from which the Legislature must have meant to protect them. Thus respondent warns that under defendant's reading, an abuser "could deprive the trial court of section 1202.05 authority to *protect the victim* by simply delaying the trial or sentencing hearing," i.e., until after the victim's 18th birthday. This assumes that after becoming an adult, the victim continues to need protection of a type the act affords. Respondent never explains what protection the act provides that such victims would otherwise lack. Having considered that question at length, we find no plausible rationale by which the Legislature might have taken upon itself the regulation of visitation between adult victims and their childhood abusers.

 Contrary to respondent's assertion, section 1202.05 does not "prohibit contact" between child abusers and their victims. The 1992 Act regulates *only* "visitation" between victims and *prison inmates*. It has no effect on other

modes of "contact," and no effect on defendants out of prison. Its *sole* effect is to prevent *personal encounters*, without court approval, between a "child victim" and a defendant confined in state prison.

The need for such protection is far from intuitively obvious. Persons wishing to avoid visitation with a state prisoner might be thought to enjoy ample protection in the very fact of his incarceration. An imprisoned person, acting alone, is quite powerless to inflict his presence on his victim or on any other member of the extramural public. Any victim wishing to avoid him need only *stay away from the prison*. Given this fact, what protection does the 1992 Act actually afford?

Two possible answers to this question suggest themselves. One is that the act is intended to protect victims *from themselves*, i.e., from their own unwise decisions to visit their former abusers. This appears to be the rationale implicit in respondent's reading of the statute. But even without the legislative history discussed below, we would be slow to conclude that the Legislature had taken it upon itself to protect adult victims of childhood sexual abuse, or any other crime, from their own voluntary decisions to visit their abusers. Indeed, while respondent couches such a regulation in terms of "protection," it is viewed just as easily, if not more easily, as an infringement on personal liberty and an inexplicable interference with the autonomy adults normally enjoy in determining and pursuing their own best interests. Moreover, while it is entirely possible that some adult victims may choose to visit their former abusers when doing so seems unwise, that possibility hardly furnishes a plausible motive for an unconditional prohibition on *any* such victim's *ever* doing so. As previously noted, the Legislature recognized that even minor victims may sometimes benefit from visiting their former abusers. A categorical ban on visitation by *adult* victims cannot be reconciled with that recognition.

Significantly, no similar objection arises if the act affects only minors. The state has long been viewed as possessing extraordinary power over the lives of children under the doctrine of *parens patriae*, which "refers to the traditional role and obligation of the state to act as guardian of children and other incompetents." (*Quigley v. First Church of Christ, Scientist* (1998) 65 Cal.App.4th 1027, 1034 [76 Cal.Rptr.2d 792], italics omitted.) The state has no similar obligation—and we would not lightly hold it vested with similar power—where competent adults are concerned. Rather, when a child turns 18 in our society, it becomes her "right and responsibility to make her own decisions." (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1415 [23 Cal.Rptr.3d 609].) Survivors of child sexual abuse, like other adults, become their own guardians, and are expected to look out for their own welfare, emotional and otherwise. (See *ibid.* [when child reaches majority, "her

parents' role will become one of influence and persuasion, rather than direction and control"].) Again, adults who do not wish to enter the company of their childhood abusers are amply protected from doing so without regard to the act. The act would only affect adult visitors who *choose* to visit their childhood abusers. Any such choice must be presumed to be the product of an autonomous will. The state has no apparent interest in interfering with it, and nothing in the 1992 Act suggests the slightest intention by the Legislature to do so.

The second possible rationale for the act's prohibition is that it is intended to protect a class of victims who *lack the power to act for their own protection*—i.e., to stay away from the prison—because their *movements are controlled by another*. In this view, the power to cause or avoid a personal encounter with a former abuser lies not in the victim but in some third person who might, in the absence of the act, subject the victim—again, unwisely—to the unhealthy effects of the abuser's company. Such third party, by controlling the movements of a victim, may deprive him or her of the protection otherwise inherent in the abuser's incarceration.

This concern seems vastly more plausible than the first one we have discussed. But it is even more obviously confined to children. Adults are generally masters of their own movements. They cannot lawfully be compelled to go to a prison area, and once there they are free to leave. Children, in contrast, are generally under the control of others on many matters, including "who may spend time" with them. (*Brekke v. Wills, supra,* 125 Cal.App.4th 1400, 1410; see *ibid.* [citing numerous authorities concerning broad powers and obligations of parents with respect to conduct of children]; *Turner v. Turner* (1959) 167 Cal.App.2d 636, 642 [334 P.2d 1011] ["The parent has authority to control the child, and to administer restraint and punishment, in order to compel obedience to reasonable and necessary directions."].)

This fact—the subordination of children to their custodians—is the key to the real purpose of the act, which is manifestly to protect children against the *unwise decisions of their caretakers* to expose them to the presence of their incarcerated abusers. We believe this purpose is readily inferred from the terms of the act and a circumspect consideration of its operation in the real world. Any doubt, however, is eliminated by the legislative history of the 1992 Act, which we have secured from the State Archives and given the parties an opportunity to discuss. These materials confirm that the sole purpose of the act was to protect *children* from the emotional harm with which they were threatened when a custodian *brought them to prison* to visit their incarcerated former abusers—as was the custodian's prerogative under prior law. The act was intended to eliminate that prerogative and require the

assent of the juvenile court before any child could be taken into a prison visiting area and subjected to the company of his or her abuser.

In a memorandum of support found in the files of the Senate Judiciary Committee, persons associated with the Children's Advocacy Institute—identified in the floor report as the source of the bill—wrote that under existing law, "no statute *prevents a parent* who desires a continuing relationship with the person convicted of molesting his or her child *from taking the child to visit* the perpetrator in prison. Contrary to popular opinion, when the perpetrator has a close relationship with a parent, the parent may not be protective or supportive of the child, even after the perpetrator has been tried, found guilty and sentenced to a prison term in a criminal court." (Director Robert Fellmeth et al., Children's Advocacy Inst., mem. to Sen. Judiciary Com. regarding Assem. Bill No. 3560 (1991–1992 Reg. Sess.) June 22, 1992, italics added.)

The same point is made in another letter—dated March 13, 1992, and addressed to the bill's sponsor—which is found in the files of both the Senate Judiciary Committee and the Assembly Committee on Public Safety. In that letter, a captain of the Juvenile Division of the San Francisco Police Department discussed the susceptibility of a "child" to relive an assault merely from being in the presence of the abuser. He then turned to the "issue" of "the parent or guardian who brings the child-victim on these visits," writing, "This person usually suffers from divided loyalties . . . . Frequently the non-incarcerated parent blames the child for having disclosed the molestation. . . . *Their emotional state renders them incapable of protecting the victim.* The system must act to *fill that void.*" (Captain Diarmuid Philpot, Juvenile Div., San Francisco Police Dept., letter to Barbara Friedman, author, regarding Assem. Bill No. 3560 (1991–1992 Reg. Sess.) Mar. 13, 1992, italics added.)

Another letter, found in the same two committees' files, was apparently sent to a legislative staff member by a social worker who identified himself as "provid[ing] specialized treatment services at the San Quentin Prison." He recounted three cases illustrating a "gap in the law that allows for child victims of sexual abuse to have contact with their incestuous fathers in the prison's waiting room." In one case, where the inmate was in prison for abusing his six-year-old stepdaughter, "the mother went to visit with her children, *subjecting the little victim* to the verbal and psychological pressure of the perpetrator." (Italics added.) In another case, an inmate "disclosed that he had been visiting regularly with his wife and their eleven year old daughter," whom he had been imprisoned for orally copulating. "Further investigation revealed that he had the 11 year old victim sit on his lap in the prison visiting room. . . . This victim was enticed to continue in her 'special

relationship' with the offender behind prison walls, which necessarily inhibited her healing process." In the third case, an inmate revealed that "he had been visiting with his family in the prison visiting room," including "his five year old daughter," whom he had sexually abused. "These child victims," the author wrote, "need at least temporary distance from the perpetrator . . . . *She (or he) can decide when to see the perpetrator.*" (Italics added.) Without legislation, however, "the protection for the psychological well being of the victim is *left to the mother,* who as evidenced by the above examples, often remains *unable to protect.*" (Steve Eckhart, L.C.S.W., letter to John Young regarding Assem. Bill No. 3560 (1991–1992 Reg. Sess.) Feb. 28, 1992, italics added.)

None of the committee reports describes the problem as straightforwardly as the letters just quoted.[9] However one report does observe that "[i]n most situations in which a child visits a state prison inmate, three persons are involved in the visit[:] The child, the inmate, and the child's custodial parent or guardian." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as proposed to be amended in committee May 5, 1992, p. 1.) And other more general comments reinforce the conclusion that legislators expected the 1992 Act to affect only visitation by children. Thus one report describes the bill as "restrict[ing] the access of specified inmates to their *victims under the age of 18 years.*" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended Apr. 1, 1992, p. 1, italics added.) Another report by the same committee refers to the bill as restricting "visitation in prison *with the minor.*" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as proposed to be amended in committee, for hearing May 5, 1992, p. 2, italics added.) Elsewhere the bill is described as "requir[ing] a juvenile court order to allow a *juvenile victim* of specified sexual offenses to visit the offender in state prison." (Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended May 18, 1992, p. 1, italics added.) Another report states, under "Duration of Orders," that "[t]he court would retain jurisdiction over the case until *the child* reached the age of 18." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended June 17, 1992, for hearing on July 7, 1992, p. 4.) Yet another report states that an "appeal" from a no-visitation order could be brought "by the legal parents or guardian and the *child.*" (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3560

---

[9] However the nature of the problem was acknowledged quite explicitly in the report of the Republican members of the Ways and Means committee, which stated that the 1992 Act "[s]hould prevent a traumatized *child* from being *forced to visit* his/her child sexual abuser." (Republican members of Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended May 18, 1992, p. 1, italics added.) The report declared it "unconscionable that a child victim should EVER be *required to visit* his/her molester." (*Ibid.,* italics added.)

(1991–1992 Reg. Sess.) as amended June 17, 1992, for hearing on June 30, 1992, p. 3.) Relief would be granted if visitation was found to be "in the *child's* best interest." (*Id.* at p. 4.)

Respondent professes to find evidence of a contrary intent in the following passage from a Senate Judiciary Committee Report (italics respondent's): " 'This bill would provide that whenever a person was sentenced to state prison for violating a specific sex crime and the *victim of one or more of these offenses was a child under the age of 18,* the court would prohibit all contact between the defendant and the child victim.' " (Apparently quoting Sen. Judiciary Com., Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended June 17, 1992, for hearing July 7, 1992, p. 2.) According to respondent, this passage "plainly refers to the age of the victim at the time of the offense." This reading might be colorable if the first half of the relevant clause ("whenever a person was sentenced . . .") were expressed in the present tense ("whenever a person *is* sentenced"). Instead the *whole sentence* is in the past tense; both the sentencing hearing ("was sentenced") and the qualifying age ("was a child") are described as past events. This renders the paragraph, at best, ambiguous. And the ambiguity is resolved *against* respondent's reading by other parts of the same report. In the paragraph following the cited passage, the bill is described as permitting visitation "only if it was determined by the court that such contact was in the *best interests of the child*"—not the "child victim," but "the child." (*Id.* at p. 2.) This language is echoed in another report by the same committee (see Sen. Judiciary Com., Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended June 17, 1992, for hearing June 23, 1992, p. 2, as well as a report by the Senate Judiciary Committee (Sen. Judiciary Com., Analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended June 17, 1992, for hearing June 30, 1992, p. 2), and the final senate floor analysis (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3560 (1991–1992 Reg. Sess.) as amended Aug. 28, 1992, p. 2). The last report also refers to the sponsor's argument that "a procedure must be developed to insure that contact between a perpetrator of sexual abuse and his or her child victim occurs only if a court has determined that it is in the best interests of *the child.*" (*Id.* at p. 3, italics added.)

■ We recognize that "courts can get [statutory meaning] wrong" by placing undue reliance on materials like these. (*J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1578 [33 Cal.Rptr.2d 206] (*J.A. Jones*); see *Martinez v. Regents of the University of California* (2010) 50 Cal.4th 1277, 1293 [117 Cal.Rptr.3d 359, 241 P.3d 855], quoting *Exxon Mobil Corp. v. Allapattah Services, Inc.* (2005) 545 U.S. 546, 568 [162 L.Ed.2d 502, 125 S.Ct. 2611] [cautioning that " '[e]xtrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms' "].) We

would be reluctant to rely on the materials cited above if they had any tendency to vary the otherwise apparent meaning of statutory language. In this case, however, they *uniformly support* the meaning that we have already found to flow most naturally from the language of the statute, as well as from its pragmatic effect and operation. Under these circumstances we believe these materials are properly consulted. (See *J.A. Jones, supra,* 27 Cal.App.4th at p. 1578 [counseling reliance on legislative history "only when that history itself is unambiguous"]; *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1413–1414 [60 Cal.Rptr.3d 719] [citing and quoting *J.A. Jones* to similar effect].)

### E. *Conclusion and Application*

▆▆▆ Nothing in the legislative history suggests any intention or expectation that the act would affect visitation between adult victims and their childhood abusers. On the contrary, the Legislature clearly contemplated that only children would be affected. It follows that the restrictions on visitation imposed by the 1992 Act apply only to victims who are under the age of 18 at the time of the contemplated visitation. Once a victim has reached that age the act has no effect on her or his ability to visit the defendant in prison. ▆▆▆ Here the trial court properly made an order under section 1202.05 as to the victim M.M., who was under 18 years of age at the time of sentencing. Its formal order after the first sentencing hearing referred only to M.M., and was thus, on its face, free of error. At the second sentencing hearing, however, the court granted the prosecutor's request that a no-visitation order be entered as to "both victims." Although the record contains no second formal order, it is plain that the court intended to prohibits visitation by A.S. Since section 1202.05 provided no authority to do so, the order cannot be sustained under that statute, and the abstract of judgment must be clarified to reflect that the no-visitation order affects only the victim M.M.

### III. *No-contact Order*

Defendant contends that the court erred further to the extent that it issued an order prohibiting "contact" between defendant and A.S., because no such order is authorized by section 1202.05 and the record does not suggest any other legal authority under which it might have been made. Respondent replies that the no-contact order "was proper under the trial court's inherent power to ensure the safety and privacy of those involved in judicial proceedings."

A threshold difficulty appears from the fact that the record before us, properly viewed, contains no such order. At the first sentencing hearing the court declared that, in addition to prohibiting visitation, it was "renew[ing]"

an outstanding "protective order." In an apparent recital of the terms of that order, the court stated that defendant was prohibited from "contact" with an unnamed "protected person." The court declared that the order would "be in effect for three years" from the hearing date. The minute order supposedly memorializing these proceedings contained checkmarks next to entries stating "No contact with victim or family," "PC1202.05," "PO [presumably, 'protective order'] . . . mod[ified] . . . Exp. [date three years thence]," and "No contact." Similar telegraphic entries appear in the abstract of judgment: "No contact with victim or family. PC1202.05 ordered. PO mod expires [date] two victims."

The court thereafter recalled the sentence and conducted a second sentencing hearing.[10] One of its stated reasons for so doing was "to correct the protective order, which did not need to be issued." Following this cryptic remark the court again made an order prohibiting "visitation" under section 1202.05. It said nothing, however, about "contact." Nonetheless, the relevant minute order contains the entry "No contact with victims," followed by "PC1202.05." Likewise, the abstract of judgment recites, "No contact with victim PC1202.05."

 These last-mentioned entries cannot properly be characterized as orders of the court. In a criminal case, it is the *oral pronouncement of sentence* that constitutes the judgment. (*People v. Mesa* (1975) 14 Cal.3d 466, 471 [121 Cal.Rptr. 473, 535 P.2d 337].) To the extent a minute order diverges from the sentencing proceedings it purports to memorialize, it is presumed to be the product of clerical error. (*Ibid.*) Likewise, the abstract of judgment " 'cannot add to or modify the judgment which it purports to digest or summarize.' " (*Ibid.*, quoting *People v. Hartsell* (1973) 34 Cal.App.3d 8, 14 [109 Cal.Rptr. 627]; see *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [109 Cal.Rptr.2d 303, 26 P.3d 1040].) As with other clerical errors, discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal. (*People v. Mitchell, supra*, 26 Cal.4th at p. 188.)

For this reason alone the references to "contact" must be stricken from the abstract of judgment. In pronouncing sentence, the court made no order prohibiting, or otherwise referring to, "contact." The clerk's entry of such a prohibition must be deemed a case of clerical error, requiring correction by this court.

Nor does it appear from this record that such an order, if made, would have been authorized. Penal Code section 136.2, subdivision (a), empowers the

[10] Neither party questions the court's power to recall the sentence. (See Pen. Code, § 1170, subd. (d); see *People v. Alanis* (2008) 158 Cal.App.4th 1467, 1475–1476 [71 Cal.Rptr.3d 139].)

trial court to make various orders to protect witnesses and victims "upon a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur." Orders made under that statute, however, are "operative only during the pendency of criminal proceedings and as prejudgment orders." (*People v. Selga* (2008) 162 Cal.App.4th 113, 118–119 [75 Cal.Rptr.3d 453]; see *People v. Ponce* (2009) 173 Cal.App.4th 378, 383 [92 Cal.Rptr.3d 667]; *People v. Stone* (2004) 123 Cal.App.4th 153, 160 [19 Cal.Rptr.3d 771].) Penal Code section 1201.3, subdivision (a), authorizes a court, in cases involving sex crimes against minors, to "issue orders that would prohibit the defendant . . . , for a period up to 10 years, from harassing, intimidating, or threatening the victim or the victim's family members or spouse." But an order prohibiting all "contact" substantially exceeds the powers granted by this statute. Penal Code section 1203.1, subdivision (i)(2), provides that when a defendant is convicted of any registrable sex offense, the court may impose stay-away and no-contact orders "as a condition of probation." But that statute applies only where a defendant is placed upon probation; defendant was sentenced to at least 30 years in prison.[11]

Respondent does not suggest that any of these statutes empowered the court below to impose a no-contact order. Instead respondent cites two federal cases finding an inherent power in federal courts to issue postconviction orders protecting victims from contact with the defendant. (*Wheeler v. U.S.* (9th Cir. 1981) 640 F.2d 1116, 1123 (*Wheeler*); *U.S. v. Morris* (7th Cir. 2001) 259 F.3d 894, 901 (*Morris*).) One court has already declined to apply those cases as respondent urges us to do. In *People v. Ponce, supra*, 173 Cal.App.4th 378, 385, the court noted that the courts in those cases emphasized the narrowness of the power exercised there.[12] In *Wheeler* the court emphasized that any order restraining mere communication by the defendant would have to rest on a demonstration that communication "pose[d] a clear and present danger to the witness" and that the danger could not be averted by less onerous means. (*Wheeler, supra*, 640 F.2d at pp. 1124, 1126.) In *Morris*, similarly, the court emphasized that the power to make such orders "must be reserved for rare and compelling circumstances." (*Morris, supra*,

---

[11] Other statutes provide similarly narrow authority for restraining orders in prosecutions for other offenses. (See Pen. Code, §§ 646.9, subd. (k)(1) [authorizing order in stalking case "restraining the defendant from any contact with the victim . . . for up to 10 years"], 1203.097, subd. (a)(2) [requiring that conditions of probation in domestic violence case include a "criminal court protective order protecting the victim from further acts of violence, threats, stalking, sexual abuse, and harassment, and, if appropriate, containing residence exclusion or stay-away conditions"].)

[12] In *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1478 [89 Cal.Rptr.3d 402], the Attorney General conceded that the trial court had erred by prohibiting the defendant, for life, from "having any contact" with his abused wife and children. That office has made similar concessions in other cases before this and other courts.

259 F.3d at p. 901.) The order there—preventing the defendant from attempting to contact his juvenile victim—was justified because a future trial was still possible, the defendant had demonstrated a willingness to inflict his "harmful influence" on the victim, and the victim was "particularly vulnerable because she is a child." (*Ibid.*)

It also bears emphasis that in both of those cases the victims or witnesses protected by the contemplated orders, or persons acting on their behalf, had sought or at least supported the orders in question. In *Wheeler, supra,* 640 F.2d at page 1118, a witness "requested protection from the court" after the defendant engaged in "harassing tactics" toward her, and persons associated with her, during and after trial. The decision in *Morris* does not disclose the precise means by which the question came up, other than that it arose at a resentencing hearing after an earlier appeal. But the order was occasioned by the defendant's "persist[ent]" efforts to communicate with the minor victim after he was imprisoned, and rested at least in part on "testimony from the victim's mother, step-father, and grandmother." (*Morris, supra,* 259 F.3d at pp. 897, 901.) It is thus readily inferred that the victim, or at least her parents, objected to the contacts.

As applied to A.S., respondent's argument again seems to rest on a foundation of dubious assumptions about what will serve her interests. She may or may not conclude, now or later, that "contact" with defendant is undesirable. We have no way of knowing her wishes, and neither we suspect does respondent. In any event, so long as defendant remains incarcerated, all he can do by way of "contact" is send her letters and, perhaps, attempt to call her on the telephone. She of course will be free to throw mail away unread, or to hang up. It also appears that correctional authorities reserve the power to block at least some attempts by inmates to communicate with outsiders, generally upon the latters' request. (See Cal. Dept. of Corrections & Rehabilitation, Operations Manual (2011) §§ 52060.5, 52060.11, 54010.29, pp. 378, 379, 427 <http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/Ch%205-Printed%20Final%20DOM%202011.pdf> [as of Feb. 28, 2012].) Nothing before us suggests that a no-contact order was even wanted by A.S., let alone necessary for her protection.

Respondent contends that if we do not uphold the no-contact order we should remand for further proceedings so that the trial court may consider the question in greater depth. We see no reason to do so. If either of defendant's victims feels he is directing unwanted communications to her, and the above correctional regulations do not furnish adequate protection, then a further remedy may be sought under Code of Civil Procedure section 527.6. That at any rate is the remedy afforded by the Legislature. If the extraordinary power

recognized in the above federal cases is available to California courts, it can and should be exercised in only the clearest cases. We see no reason, and respondent identifies none, to suppose that this is, or could on remand become, such a case.

### DISPOSITION

The judgment is modified to specify that the no-visitation order under section 1202.05 applies only to the minor victim M.M. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and, in addition, striking all references to "contact." In all other respects the judgment is affirmed.

Premo, J., and Elia, J., concurred.