EGERTON, J., Dissenting.
I respectfully dissent. In my view, we can and should reconcile Penal Code section 1170.1, subdivision (c), with section 3051. The plain language of the statutes, read with the Legislature's purpose in enacting each in mind, leads to the conclusion that an inmate who is granted parole for a life crime committed when he was younger than 26 must still serve his consecutive term for a new and different offense committed in prison when he was no longer youthful by any definition.
1. Jenson's 1979 murder of L.C. Walker, his 1989 assault on an officer with a knife, and the 2016 parole hearing
In 1979 a jury convicted petitioner Ronald Jenson of the first degree murder of L.C. Walker with a shotgun. The presiding commissioner at Jenson's April 2016 parole hearing summarized the facts of the crime: "A 64-year old male victim was fatally shot at a gas station. It was reported that he was visiting the gas station attendant who was sitting inside the gas station watching television. According to the attendant, four males entered the gas station with weapons in their possession. Mr. Jenson, who had a shotgun, pressed the weapon into the victim's side, and another suspect was holding a handgun nearby. The victims were told to sit down and not move. The victim who was killed had a revolver in his pocket, and told the suspects why don't you kids go on away from here. And his hand came out of his pocket with the handle of the gun visible, at which point the shotgun was fired striking the victim. ... The victim died from his injuries." The trial court sentenced Jenson to life with a minimum eligible parole date of 27 years (25 years to life for the first degree murder plus two years for his use of a firearm *881 under the then-applicable version of Penal Code section 12022.5[15] ).
While in prison, Jenson committed three more felonies. He committed two of those crimes-escape without force and manufacture or possession of a deadly weapon by an inmate-during his first year in prison. Jenson was 21 at the time. Then, in 1989, Jenson was charged with assault with a deadly weapon on a peace officer.[16] Jenson was 29 when he committed that offense. Jenson spoke about the crime at his April 2016 parole hearing. Jenson said *286 the officer had used a racial slur in referring to Jenson's mother and his wife. The officer "told [Jenson] what he was going to do to them sexually." Jenson continued, "And unfortunately at that time, I lost my cool and I went and got a knife, and I stabbed him and he almost lost his life."
The Marin County District Attorney filed charges. On November 29, 1989, Jenson entered into a plea agreement with the People. Jenson pleaded guilty to the charge. The court sentenced him to the agreed-upon term of five years in the state prison, to be served consecutively to the life term. The People struck an enhancement on the assault with a deadly weapon count and dismissed a second count as part of the plea deal.
In late 2014, the parole board granted Jenson parole. However, in March 2015, Governor Brown reversed the board's decision. The Governor described Jenson's murder of Walker as "senseless." The Governor continued, "Mr. Jenson's conduct in prison demonstrates an inability to control his temper and abide by the rules. He has been disciplined for serious misconduct 48 times and less serious misconduct 42 times. Ten of his serious disciplinary actions were for violent behavior including stabbing a correctional officer in the neck, attempting to stab staff, assaulting an inmate, stabbing an inmate, spitting in staff members' faces, fighting with another inmate, and possession of inmate-manufactured weapons." The Governor commended Jenson for his "efforts to improve himself during his 36 years of incarceration." However, in reversing the board's decision to parole Jenson, the Governor noted Jenson's "extensive criminal history and many violent acts while incarcerated." This court denied Jenson's petition for a writ of habeas corpus challenging the Governor's decision.
As noted, Jenson had another parole hearing on April 29, 2016. At the hearing, Jenson insisted he did not commit the 1979 murder of Walker. He had been, he said, falsely accused and wrongly convicted. Jenson stated a man named James Downey had fingered him for the crime because of a dispute over a woman. Jenson also said Walker's friend, eyewitness Walter Diggs, had not positively identified him and had been led by the prosecutor in his testimony at trial.[17] In addition, Jenson blamed his co-defendant for testifying against him.
At the 2016 parole hearing, the deputy district attorney representing the People asked the commissioners to question Jenson about custodial counseling chronological documentations (so-called CDC-128- *882 A's) he received in 2007, 2009, and 2010 for disobeying direct orders of corrections personnel. *287 The district attorney argued against parole for Jenson, stating, "[Jenson] has continued since he was a youth through the transition period into adulthood to violate rules in prison. He has an extremely, for a long time, bad record in prison. I would argue 2007, 2009, 2010 are a continuation."
2. Discussion
Jenson's writ petition presents a question of statutory interpretation. In construing statutes, " 'our fundamental task is "to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." ' ( Mays v. City of Los Angeles (2008) 43 Cal.4th 313, 321 [74 Cal.Rptr.3d 891, 180 P.3d 935].)" ( Apple Inc. v. Superior Court (2013) 56 Cal.4th 128, 135, 151 Cal.Rptr.3d 841, 292 P.3d 883 ); see also Weidenfeller v. Star & Garter (1991) 1 Cal.App.4th 1, 5, 2 Cal.Rptr.2d 14 ["Our obligation is to interpret the statute 'to effectuate the purpose of the law.' ( [ ] Santa Barbara County Taxpayers Assn. v. County of Santa Barbara (1987) 194 Cal.App.3d 674, 681 [239 Cal.Rptr. 769]."].) "[S]tatutes must be construed in a reasonable and common sense manner consistent with their apparent purpose and the legislative intent underlying them-one practical, rather than technical, and one promoting a wise policy rather than mischief or absurdity." ( Herbert Hawkins Realtors, Inc. v. Milheiser (1983) 140 Cal.App.3d 334, 338, 189 Cal.Rptr. 450.) "As always, we start with the language of the statute, 'giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' ( Pineda [v. Williams-Sonoma Stores,Inc. (2011) ] 51 Cal.4th [524,] 529-530 [120 Cal.Rptr.3d 531, 246 P.3d 612].)" ( Apple , at p. 135, 151 Cal.Rptr.3d 841, 292 P.3d 883.) " 'We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' ( Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)" ( In re Coleman (2015) 236 Cal.App.4th 1013, 1018, 186 Cal.Rptr.3d 922 ( Coleman ).)
Penal Code section 1170.1, subdivision (c) -enacted in 1976 and amended many times since-provides, "In the case of any person convicted of one or more felonies committed while the person is confined in the state prison ... and the law either requires the terms to be served consecutively or the court imposes consecutive terms, the term of imprisonment for all the convictions that the person is required to serve consecutively shall commence from the time the person would otherwise have been released from prison." These *288 consecutive terms commencing on what otherwise would have been the inmate's release date have come to be known as Thompson terms, after In re Thompson (1985) 172 Cal.App.3d 256, 218 Cal.Rptr. 192. The reason the Legislature enacted Penal Code section 1170.1, subdivision (c), is obvious and sound: to deter inmates from committing more crimes while in prison. "It is well established the Legislature intended that 'in-prison crimes ... be punished more severely than crimes committed "on the outside." ' ( [ *883 People v. ] White [ (1988) ] 202 Cal.App.3d [862,] 869 [249 Cal.Rptr. 165].)" ( Coleman , supra , 236 Cal.App.4th at p. 1022, 186 Cal.Rptr.3d 922.) "Commencing the consecutive sentence for the custodial offense on the date the prisoner otherwise actually would have been released on parole is consistent with the Legislature's intent to punish and deter criminality in prison." ( Ibid . )
Penal Code section 3051 -enacted in 2013 and amended several times since-grants a youth offender (now defined as an inmate who committed his controlling offense before he was 26 years old) a parole hearing after 15, 20, or 25 years, depending on the controlling offense. An inmate like Jenson, who was convicted of first degree murder committed when he was 19 years old, is entitled to a youth offender parole hearing after 25 years. ( Pen. Code, § 3051, subd. (b)(3).) Subdivision (h) of the statute carves out three categories of inmates who are not entitled to receive a youth offender parole hearing: (1) inmates serving a third strike sentence; (2) inmates sentenced to life without the possibility of parole for crimes committed as adults; and (3) inmates who, at age 26 or older, commit an additional crime that requires malice aforethought or that results in another life sentence. ( Pen. Code, § 3051, subd. (h).)
These two statutes can be reconciled. The carve-out provision in Penal Code section 3051, subdivision (h), denies the three categories of inmates listed there any youth offender parole hearing at all . By contrast, an inmate like Jenson, who committed a life crime while 25 or younger, will receive his youth offender parole hearing after 25 years. The board may grant that inmate parole. But that grant does not mean that the inmate now does not have to serve his consecutive Thompson term for a crime committed when he was 26 or older.[18] Here, Jenson was nearly thirty years old when-according to his own account-he went and procured a knife (showing planning and not simply an impulsive act), and then stabbed an officer in the neck, nearly killing him. At that age, Jenson was fully an adult, and the Legislature's concerns for the "diminished culpability of juveniles as compared to adults," the "hallmark features of youth," and the recognition that "children are constitutionally different from adults for purposes of sentencing" ( In re Trejo , at pp. 980-981, 987, 216 Cal.Rptr.3d 855 ) no longer apply.
*289 Consider this hypothetical: A 25-year-old man shoots and kills someone. A jury convicts him of first degree murder and finds the gun allegation true. The defendant also has a prior strike-let's say for robbery, when he was 24. The court sentences him to life with a minimum eligible parole date of 80 years (25 years to life for the first degree murder, doubled because of the strike prior, plus 25 years for the intentional discharge of the gun causing death, plus a five-year prior under Penal Code section 667, subdivision (a) ). Twenty years later, at the age of 45, the inmate sexually assaults a fellow inmate, or a guard. He is convicted of that crime, his sentence to be served consecutively. The inmate nevertheless will receive a youth offender parole hearing 25 years after his commitment for the murder. The board may grant him parole on his life case, effectively knocking 55 years off of his sentence. But the inmate still must serve his Thompson term for the sexual assault. Read this way, consistent with their plain language, Penal Code section 1170.1, subdivision (c), and section 3051 are not inconsistent. The inmate gets a hearing after 25 years, effectuating the Legislature's concern *884 for youthful offenders, and the inmate still must serve his term for his in-prison crime committed as a fully grown adult, effectuating the Legislature's purpose of deterring prison inmates from committing more crimes while in custody.
Finally, Penal Code sections 3041 and 3046 do not change this analysis. Penal Code section 3046 generally addresses parole for defendants sentenced to life. Subdivision (c) provides that an inmate found suitable for parole after a youth offender parole hearing "shall be paroled regardless of the manner in which the board set release dates pursuant to subdivision (a) of Section 3041, subject to subdivision (b) of Section 3041 and Sections 3041.1 and 3041.2, as applicable." ( Pen. Code, § 3046, subd. (c).) Penal Code section 3041 sets forth the workings of parole generally. Section 3041, subdivision (a)(4), states, "Upon a grant of parole, the inmate shall be released subject to all applicable review periods. However, an inmate shall not be released before reaching his or her minimum eligible parole date as set pursuant to Section 3046 unless the inmate is eligible for earlier release pursuant to his or her youth offender parole eligibility date ...." ( Pen. Code, § 3041, subd. (a)(4).) Penal Code sections 3041.1 and 3041.2 have to do with the Governor's right to review parole decisions.
Neither Penal Code section 3041 nor section 3046 mentions section 1170.1(c). Again, a grant of parole to an inmate like Jenson does not mean the inmate now is relieved of his obligation to serve his Thompson term for a crime committed when no longer a "youth." Returning to the hypothetical inmate discussed above, these statutes work this way: Under Penal Code section 3046, subdivision (c), the inmate may be paroled from his life sentence after 25 years, without having to wait for his previous minimum eligible parole date of 80 years. But he is "paroled" to his Thompson term, in Department of Corrections terms. By contrast, an inmate serving a life *290 sentence for a crime committed when 25 or younger who does not commit any in-custody crime, and therefore owes no Thompson term, is released immediately under Penal Code section 3041, subdivision (a)(4) ; he does not have to serve his remaining time for-for example-his gun use causing the victim's death or for his prior strike.
In sum, in my view, the Legislature-in enacting Penal Code section 3051 -cannot have meant to give inmates who committed their controlling offense at age 25 or younger a free pass for any and all future crimes committed in prison when they cannot be considered "youth" by any definition of the word, statutory or otherwise. I do not believe our Legislature intended implicitly to repeal Penal Code section 1170.1, subdivision (c), or to change the law so that a youth offender who later, at nearly 30 years of age, attacks a guard with a knife, almost killing him, does not have to serve his Thompson term for that crime. Construing the two statutes in this reasonable and common sense manner consistent with their apparent purpose and the legislative intent underlying them promotes the wise policies of both leniency toward youthful offenders and the protection of inmates, guards, and other corrections staff from crimes committed in prison by fully grown men and women. Respectfully, this interpretation "comports most closely with the apparent intent of the Legislature, with a view toward promoting, rather than defeating, the general purpose of the statute[s] ...." ( People v. Scott (2012) 203 Cal.App.4th 1303, 1313, 138 Cal.Rptr.3d 236.) I would deny Jenson's petition.

Under current law, a perpetrator's intentional discharge of a firearm causing death or great bodily injury adds 25 years to a first degree murder sentence under Penal Code section 12022.53, subdivision (d).

At the time, that crime constituted a violation of Penal Code section 245, subdivision (b). Now, section 245, subdivision (c), is the applicable provision for that crime.

The board was unable to locate the court of appeal's decision affirming Jenson's conviction, so the commissioners asked Jenson if Diggs had identified him at trial.

Under In re Trejo (2017) 10 Cal.App.5th 972, 216 Cal.Rptr.3d 855, Jenson does not have to serve his Thompson terms for the felonies committed in prison when he was 21 years old.