Filed 11/26/24  In re M.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.P.,<br><br>    Defendant and Appellant. | E083637<br><br>(Super.Ct.No. INJ2000037)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Emily A. Benjamini, Judge.  Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

This is M.P.'s second appeal from an order transferring him from juvenile court to a court of criminal jurisdiction under Welfare and Institutions Code section 707.[1]

M.P. is alleged to have committed one count of murder and two counts of attempted murder when he was 17 years old. His case was initially transferred to criminal court in December 2021. M.P. appealed, and we affirmed the transfer order in an unpublished opinion. (*In re M.P.* (July 29, 2022, E078295) [nonpub. opn.].)

The criminal court later returned M.P.'s case to the juvenile court for a new transfer hearing following the passage of Assembly Bill No. 2361 (Assembly Bill 2361), which amended section 707 by raising the burden of proof on a transfer motion.

At M.P.'s second transfer hearing, the juvenile court considered the evidence presented at the initial transfer hearing, along with additional evidence presented by the parties. In April 2024, the juvenile court again concluded M.P. was not amenable to rehabilitation under the jurisdiction of the juvenile court and transferred the matter back to criminal court.

M.P. appeals the transfer order. He contends the juvenile court did not properly apply section 707 because it did not make a finding on amenability to rehabilitation

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2

"separate and distinct" from its consideration of the five statutory criteria set forth in section 707, and that there was not sufficient evidence to support the juvenile court's transfer order. We affirm.

## BACKGROUND[2]

1. *The Charged Offenses*

"On the night of July 14-15, 2020, [M.P.] and his girlfriend, Desirae S., were at a house in Desert Hot Springs with a friend, Angel Arangure.[3] Desirae contacted a marijuana dealer and ordered $20 worth of marijuana.

"[M.P.] then told Desirae and Angel that he was going to rob the dealer. He told Desirae to walk up to the car and distract the victims. He told Angel to shine a flashlight into the car to blind or disorient them.

"The dealer, Pablo Encino, arrived in a car driven by his friend Alejandro R. Their friend Bryan Lopez was sitting in the back seat. Desirae walked up to the car, asked to see the marijuana, and took out money to pay for it. As she did, Angel shone the flashlight as instructed. [M.P.] pulled out a gun and yelled '[G]imme all your shit!'.

---

**2**     Our summary of the facts in sections 1-3 below is taken from our initial opinion in this matter. (*In re M.P.*, *supra*, E078295.)

**3**     "We give adults' first and last names and juveniles' first names and last initials. Thereafter, however, for consistency, we use first names for both."

"Alejandro R. reversed out of the driveway, then accidentally shifted into neutral, rather than drive; he stepped on the gas, but the car did not move. [M.P.] yelled, 'Stop the car!' [M.P.] then fired seven shots at the car.[4]

"Pablo was hit in the back of the head and died two days later. The right side of Bryan L.'s neck or shoulder was grazed. Alejandro R. was unhurt.

"A neighbor came out to see what was going on; Angel said to her, 'Sorry for the noise.' [M.P.] and Angel tried to leave in Angel's car, but it would not start. Realizing that the police were coming, they went inside and pretended to be asleep.

"A police officer who was in the area to investigate a different incident saw the victims' car enter the driveway of a house. Shortly afterward, he heard shots. Shortly after that, he saw the same car pull over and heard the occupants screaming. Their rear window was shattered. In the victims' car, the police found marijuana, cannabis oil, and marijuana paraphernalia.

"The police went to the house where the victims had been seen entering the driveway. There were about eight people there, including [M.P.], Desirae, and Angel. After the neighbor told them about Angel's apology, they detained Angel and interviewed him. He denied any involvement. After the interview, however, as officers were taking him to a holding cell, he 'began crying and said the shooter was [M.P.]'

---

**4**    "[M.P.] later told Desirae 'that he "fucked up" and that he saw the passenger reach down and he got scared and shot at the vehicle.' As the probation officer noted, however, if he really shot because he was afraid, then he would hardly have yelled 'Stop!' when the car started to drive away."

"Police went to [M.P.'s] and detained him and Desirae. [M.P.] volunteered, 'I'm the one you're looking for.' He agreed to be interviewed but said he was asleep when the shooting occurred.

"Desirae also agreed to be interviewed. At first, she, too, said she was asleep when the shooting occurred. Eventually, however, she described the crime.

"The police used a pretext to place [M.P.] and Desirae together in an interview room. Desirae whispered, '"They know you're the shooter."' [M.P.] whispered back, '"Shut the fuck up."'

"According to both Desirae and Angel, the minor carried a gun 'on a regular basis.' Eventually, Angel told the police where the gun was. They found it concealed in the air filter box of a car in his brother's garage. The serial number of the gun was missing." (*In re M.P.*, *supra*, E078295.)

2. *Wardship Petition and Initial Motion to Transfer*

"[M.P.] was charged with one count of murder (Pen. Code, § 187, subd. (a)) and two counts of attempted murder. (Pen. Code, §§ 187, subd. (a), 664, subd. (a).) On each count, an enhancement for personally discharging a firearm and causing great bodily injury or death was alleged. (Pen. Code, § 12022.53, subd. (d).) As to the murder of Pablo, a robbery-murder special circumstance was alleged. (Pen. Code, § 190.2, subd. (a)(17)(A).) As to the attempted murder of Bryan, an enhancement for personally inflicting great bodily injury or death was also alleged. (Pen. Code, § 12022.7, subd. (a).)" (*In re M.P.*, *supra*, E078295.)

In July 2020, the prosecution filed a motion to transfer M.P.'s case to adult criminal court.  (*In re M.P.*, *supra*, E078295.)

3.  *Evidence from the Initial Transfer Hearing*

A.  *Criminal History*

"On January 23, 2020, six months before the charged offenses, the police stopped a car on suspicion that it was involved in reports of 'shots fired.'  The driver had two passengers—Angel, in the front passenger seat, and [M.P.], in the rear passenger seat.

"In the car, the officer found two guns in the car.  The driver admitted being in possession of the semiautomatic found between the driver's seat and the center console. The other gun, a revolver under the front passenger seat, could have been in the possession of either Angel or [M.P.]

"The driver and Angel both indicated that it was [M.P.] who was in possession of the revolver.  It was pointing backward.  Given the size of the revolver, assuming the person who placed it under the seat pulled it out of his waistband first, that would mean it was the minor, in the rear seat, who put it there.

"Both guns smelled as if they had been fired recently (but not necessarily that day).  However, the revolver was fully loaded.

"In March 2020, [M.P.] admitted one count of possession of a loaded firearm in a vehicle (Pen. Code, § 25850, subd. (c)(6)); a charge of unlawful possession of a handgun by a minor (Pen. Code, § 29610) was dismissed.  He was granted deferred entry of judgment and placed on probation.

6

"He violated his probation by failing to perform community service, smoking marijuana, possessing a gun, continuing to associate with Angel, and ultimately by committing the charged crimes. His mother did not approve of him associating with Angel, so he lied to her about where he was going.

"Between March and July 2020, however, due to the COVID-19 pandemic, juvenile probation was 'closed' and most rehabilitative services were unavailable. [M.P.]'s probation officer did carry out one home visit and phoned him weekly to check up on him." (*In re M.P.*, *supra*, E078295.)

B. *Gang Membership*

"When M.P. was 14, he became involved in the 'Desert Town' gang. One of his older brothers tried to talk him out of being a gang member, but he did not listen. Angel was a member of the same gang." (*In re M.P.*, *supra*, E078295.)

C. *M.P.'s Upbringing*

"[M.P.] was born and raised in the Desert Hot Springs area. He was the third oldest of nine siblings. His father physically abused the children and their mother. [M.P.]'s mother and father separated when he was six; his father was deported when he was eight.

"When [M.P.] was 10, his mother met a man she later married. When she married him, they both used methamphetamine. As a result, [M.P.] and his siblings were removed from the home. [M.P.] was placed in foster care, together with his two older

7

siblings, for eight months.  Once he was returned home, he had a good relationship with both his mother and his stepfather.

"Between fourth grade and . . . ninth grade, [M.P.] was suspended some 10 to 15 times.

"When [M.P.] was 16, a cousin to whom he was close was accidentally shot and killed.  [M.P.] felt 'traumatized.'

"At the time of the offense, [M.P.] lived with his mother, stepfather, siblings, and grandmother.  One sibling had been involved in a 'small misdemeanor incident which was later dismissed and sealed . . . .'  Otherwise, none of the siblings had a criminal record or was in a gang."  (*In re M.P.*, *supra*, E078295.)

D.  *Mental Health and Substance Abuse*

"[M.P.]. smoked marijuana daily.  He claimed variously that he started at either 9 or 10 or at 13.  He gave conflicting statements about whether he also sold marijuana.

"He started drinking alcohol when he was 15.  He also gave conflicting statements about how often he drank—either once a week, or once every two months.

"When [M.P.] was 12 or 13, he was diagnosed as having ADHD and bipolar disorder.  He started taking psychotropic medications, including Adderall and/or Clonidine for ADHD and Latuda for bipolar disorder.  After about two years, however, he stopped taking them, because they made him feel 'weird' and he felt he no longer needed them.

8

"Starting when he was 13 or 14, he had seizures, but these stopped after he hit his head in a fall off a bicycle.

"He had auditory hallucinations (though not command hallucinations). He also reported a visual hallucination involving 'dark shadows.' However, he contradicted himself about when he had hallucinations and how severe they were." (*In re M.P.*, *supra*, E078295.)

E. *Post-Arrest Conduct in Juvenile Hall*

"When [M.P.] was arrested, he had finished three years of high school and had a grade point average of 1.66. While in custody, he finished his senior year and obtained a general education diploma. He started taking junior college courses online.

"While in custody, [M.P.] was one of six inmates who fought with a single inmate; the fight may have been gang-related. Another time, he called another inmate the N-word, which resulted in a fight.

"He also had some lesser disciplinary violations: possession of 'many items' of contraband; three-way calling, three-way texting, and Zoom calling with unauthorized people; two refusals to meet with his behavioral therapist; tagging in his room; and using profanity to staff. Otherwise, the probation officer considered his behavior to be 'near perfect.'" (*In re M.P.*, *supra*, E078295.)

F. *Mental Health Evaluations*

  i. *Dr. Jones (I)*

"Dr. William Jones evaluated [M.P.] in August 2020.  He accepted [M.P.]'s prior diagnoses of ADHD and bipolar disorder; additionally, he diagnosed him as having PTSD.  These conditions 'would . . . increase impulsivity and emotional overreactivity to events around him.  . . . [H]e would have an increased likelihood of engaging in self-defeating and high-risk behavior with little thought to possible consequences of his behavior to himself and others.'  [M.P.] admitted 'that he was impulsive and did not think about possible consequences before he acted.'

"In Dr. Jones's opinion, [M.P.] 'very much needs and would likely benefit from intensive psychotherapy . . . .'  He 'would benefit from continued psychiatric treatment with use of psychotropic medication . . . .'  He also needed 'an intensive substance abuse treatment program . . . .'" (*In re M.P.*, *supra*, E078295.)

  ii. *Dr. Suiter*

"Dr. Robert Suiter evaluated [M.P.] in October 2020.

"[M.P.] told Dr. Suiter that he bought the gun found in January 2020 'on the street.'  He had practiced shooting it twice, in the desert.

"Dr. Suiter diagnosed [M.P.] as having ADHD, a substance abuse disorder, and possibly a conduct disorder.  '[T]he essential feature[s] of conduct disorder' are '[v]iolating the rights of others, not following the rules,' and '[n]ot following societal

10

norms.'  A combination of ADHD and a conduct disorder 'make[s] a favorable treatment outcome more difficult.'

"In a test for PTSD, [M.P.] showed a tendency to overreport; even so, the results were valid and showed no PTSD.

"Testing showed heightened impulsivity.  It also showed 'some tendency to resort to the use of a gun and/or violence in situations where he feels he has been shamed or . . . where it would result in him feeling a sense of power and safety.'  In his testing responses, [M.P.] admitted that 'he broke into a house, car or building [and] he intentionally damaged a car or broke windows or things in a building . . . .'

"The testing that Dr. Suiter did could not reveal whether a person is or is not amenable to treatment.  He did conclude that [M.P.] would benefit from therapy." (*In re M.P.*, *supra*, E078295.)

### iii. *Dr. Jones (II)*

"Dr. Jones evaluated [M.P.] again in March 2021, specifically to 'assess . . . emotional trauma.'

"Dr. Jones continued to accept the prior diagnosis of bipolar disorder.  However, he believed that [M.P.] also had schizoaffective disorder.  In addition, Dr. Jones's testing showed that [M.P. ] had PTSD.  It indicated that [M.P.] 'externalize[d] and/or reduce[d] stress through self[-]destructive or self[-] injurious behavior and aggression . . . .'

"Dr. Jones continued to believe [M.P.] needed 'intensive psychotherapy,' substance abuse treatment, and possibly psychotropic medication.  In his opinion,

11

'treatment . . . could result in substantially improved functioning by age 25 or sooner . . . . He would be unlikely to present much of a risk to the safety of the community if he continues to participate in treatment and abstain from drug and alcohol usage.'" (*In re M.P.*, *supra*, E078295.)

        iv. *Dr. Bosch*

"Dr. Jennifer Bosch evaluated [M.P.] in June 2021.

"[M.P.] told Dr. Bosch that he had never bought a gun, and he was not in possession of the guns found in January 2020. As she noted, that contradicted what he had told Dr. Suiter.

"She diagnosed him as having ADHD, conduct disorder and a substance abuse disorder. Bipolar disorder was also a possibility. She found no signs of psychosis. She rejected a diagnosis of either PTSD or schizoaffective disorder. A diagnosis of both ADHD and a conduct disorder tended to predict a future antisocial personality disorder.

"In his testing responses, [M.P.] admitted 'stealing, shoplifting, lying, breaking[] or destroying property, swearing, and generally being oppositional.' Testing showed that '[a]ssaultive or aggressive acting-out behavior might be present given his report of considerable problems in controlling his anger. He may appear overly interested in violence and aggression.' 'He shows a pattern of disinhibition . . . that can be manifest[ed] through high risk-taking, impulsivity, and irresponsibility. He appears to be less bound by moral restraints than other people and shows callous disregard for others.' He 'lack[ed] empathy'; he 'demonstrate[d] little or no compassion for others . . . .'

"'He fears displaying weakness . . . .' Gang members view mental illness as a weakness, so being a gang member can affect the 'ability to be treated.'

"He told Dr. Bosch that he used marijuana daily but he was not an addict. '[I]t's denial,' she testified. 'If a person is in denial about an addiction, it makes them less amenable to treatment.' In Dr. Bosch's opinion, 'he would need to address the drug and alcohol issues first . . . .' However, 'he lacks insight[,] which would be important for being able to address that issue[.]' She believed [M.P.] needed therapy, but she expected him to be resistant to it and to 'have difficulty sustaining therapeutic relationships.'

"Recently, he was 'doing well' and had 'expressed a desire to make some major changes.' However, she found it 'hard to predict,' if he was treated as a juvenile, whether he 'would continue to be as motivated as he currently is . . . .' 'If he should enter [placement] with this same mindset tied to a gang and gang lifestyle mentality, then the prognosis for [M.P.] is poor.'" (*In re M.P.*, *supra*, E078295.)

G. *Placement Options*

"If [M.P.] stayed in the juvenile system, he could be placed in 'Pathways to Success,' a locked-down facility with an array of customized treatment services. However, Pathways was a brand-new program with no track record of successful rehabilitation. [M.P.] would remain in custody for approximately six years, until his 25th birthday." (*In re M.P.*, *supra*, E078295.)

13

### 4. *Ruling at the Initial Transfer Hearing*

The juvenile court found that two of the five statutory criteria—M.P.'s previous delinquent history and prior attempts by the juvenile court to rehabilitate him—weighed against transfer. It found the other three statutory criteria—M.P.'s criminal sophistication, the likelihood of rehabilitation, and the circumstances and gravity of the offenses—weighed in favor of transfer.

It concluded: "based on an evaluation of all of the criteria and factors and based on the totality of the circumstances as presented [¶] . . . that the [People] ha[ve] met their burden of proof that [M.P.] is not suitable for and cannot be rehabilitated within the juvenile court system . . . ."

### 5. *PostTransfer Proceedings*

M.P. appealed the initial transfer order, and we affirmed in an unpublished opinion. (*In re M.P.*, *supra*, E078295.)

While M.P.'s criminal case was pending, the Legislature passed Assembly Bill 2361 which amended section 707 by raising the burden of proof on a transfer motion from preponderance of the evidence to clear and convincing evidence. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416.) The criminal court transferred M.P.'s case back to the juvenile court to hold another transfer hearing applying the higher standard of proof.

### 6. *Evidence from the Second Transfer Hearing*

The second transfer hearing was held over the course of three days in December 2023 and February 2024. The juvenile court considered the evidence presented at the

14

initial transfer hearing, an informational update submitted by the probation officer, and additional evidence submitted by the parties.

A. *Informational Update Submitted by the Probation Officer*

The probation officer's informational update stated the report "should not be considered a recommendation to return [M.P.'s] matter to the juvenile jurisdiction." However, if M.P. were returned to the juvenile system, he would be both eligible and suitable for a commitment to Pathways for Success. At Pathways to Success, M.P. would be assigned a multidisciplinary treatment team that would create an individualized plan to address M.P.'s needs, which could include aggression replacement training, gang awareness, parenting, substance abuse treatment, thinking for change, and victim awareness. Based on M.P.'s age of 20, he would receive approximately five years of treatment before he aged out of the juvenile system.

B. *Prosecution Evidence*

The prosecutor presented evidence that since the initial transfer hearing M.P. was involved in five assaults at the county jail.

On January 14, 2022, M.P. and three other inmates surrounded a fourth inmate and struck him with closed fists. The victim sustained a nasal fracture. M.P. was determined to be an aggressor, but no charges were filed because the victim did not want to pursue prosecution. The victim believed the assault could have stemmed from a shooting on the street that involved people he knew.

On August 30, 2022, a fight broke out in the jail dayroom between two inmates. Several other inmates, including M.P., joined the fight on behalf of one of the inmates, resulting in 14 inmates punching and kicking the victim. The victim sustained severe bruising on his head and neck. He was transported to the hospital for further evaluation. M.P. and 13 others were later charged with assault by means of force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(4).) The prosecutor played a video of this assault at the transfer hearing.

On September 7, 2022, M.P. punched another inmate in the head. The inmate fell to the ground, and M.P. and four other inmates continued to punch him while he was on the ground. The victim sustained redness to the side of his face. A photograph of M.P. taken after the incident showed a large "D" tattoo on his chest.

On April 4, 2023, a fight broke out in the jail. M.P. and several others joined the fight. M.P. struck another inmate in the head, causing him to fall to the ground. A third inmate then got on top of the inmate who fell to the ground and repeatedly punched him in the head.

On October 18, 2023, two inmates were arguing in front of a cell. M.P. was standing nearby. One of the inmates involved in the argument entered his cell. M.P. ran over, entered the inmate's cell, and initiated a fight. Two other inmates joined in. The victim sustained bruising and swelling to his nose. The prosecutor played a video of this assault at the transfer hearing.

C.  *Defense Evidence*

M.P.'s counsel provided the death certificates of two of M.P.'s brothers, and an additional psychological evaluation of M.P. conducted by Dr. Gimel Rogers.  M.P.'s brothers died within two days of each other in February 2023.  His younger brother was shot and killed, and his older brother died by suicide.

Dr. Rogers evaluated M.P. in August 2023.  Her primary diagnostic impression of M.P. was "other specified disruptive, impulse-control, and conduct disorder."[5]  He "demonstrated significant difficulties in the self-control of emotions and behaviors." "This has manifested in aggression, overreactions to situations, and significant conflict with societal norms or authority figures."  M.P. also met the diagnostic criteria for "other specified trauma and-stressor related disorder" based on the trauma he experienced as a child, and "cannabis use disorder, in sustained remission, in a controlled environment." M.P.'s brain development "was likely impacted as a result of the multiple incidents of severe childhood abuse and neglect, witnessing domestic violence as a child, and community violence," and substance abuse has "adversely impacted [his] development" and "contributed to his inability to effectively regulate his emotions, adaptively cope, and make well-informed decisions."  M.P.'s testing responses reflected high levels of difficulty in anger regulation which could "reflect a youth characterized by short tempers, hostile intentions, and a lack of behavioral control," although Dr. Rogers believed M.P.'s aggression lacked a criminal sophistication.  The testing results also reflected that M.P.

---

[5]    The "other specified" designator is used when a person meets some but not all of the diagnostic criteria for a particular disorder.

17

was not likely to have psychopathic or antisocial beliefs that would serve as a barrier to his engagement in services.

Dr. Rogers noted that M.P. was doing well in juvenile hall before he was transferred to adult criminal court. He graduated high school and enrolled in college courses, participated in individual and group therapy, and engaged in substance use programming. Dr. Rogers believed that "[s]taying in a system focused on rehabilitation versus punitive measures will allow [M.P.] to heal and thrive." Overall, Dr. Rogers concluded M.P. could be rehabilitated in the juvenile system.

6. *Ruling at the Second Transfer Hearing*

The juvenile court issued a 17-page order that addressed each of the five statutory criteria bearing on transfer. The court found four of the criteria weighed in favor of transfer—M.P.'s criminal sophistication, whether M.P. could be rehabilitated before the expiration of the juvenile court's jurisdiction, M.P.'s previous delinquent history, and the circumstances and gravity of the offense. It found one of the criteria—the prior attempts by the juvenile court to rehabilitate M.P.—weighed against transfer. Then, "based on an evaluation of all of the criteria and factors and based on the totality of the circumstances," the court found by clear and convincing evidence that M.P. was not amenable to rehabilitation under the jurisdiction of the juvenile court and ordered him transferred to criminal court.

M.P. timely filed a notice of appeal.

18

**DISCUSSION**

M.P. contends we should reverse the transfer order because: (1) recent changes in the law required the juvenile court to make a finding on amenability to rehabilitation that was "separate and distinct" from its consideration of the five statutory criteria set forth in section 707; and (2) there was not sufficient evidence to support the juvenile court's transfer order. For reasons explained below, we reject these arguments.

1. *Legal Framework*

Section 707 governs the procedures for transferring a minor from juvenile court to a court of criminal jurisdiction. It provides that when a minor age 16 years or older is alleged to have committed a felony, the prosecutor "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).) "The prosecution bears the burden of proving that the minor should be transferred." (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

The Legislature recently amended section 707 through Assembly Bill 2361 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 330, § 1) and Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill 545) (Stats. 2023, ch. 716, § 1).

Effective January 1, 2023, Assembly Bill 2361 made three changes to section 707: (1) it increased the prosecution's burden on a transfer motion from preponderance of the evidence to clear and convincing evidence; (2) it established that the "ultimate question" for the juvenile court to decide is whether the minor is amenable to rehabilitation; and (3) it required the juvenile court to not only recite the basis for its decision, but also the

19

reasons supporting a finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 416.)

Assembly Bill 2361 added the following italicized language to section 707: "Following submission and consideration of the [probation officer's] report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court*." (§ 707, subd. (a)(3), italics added; *Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

The five statutory criteria the juvenile court is required to consider in a transfer motion were not amended by Assembly Bill 2361. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.) Those criteria are: (1) "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of

20

previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)). As to each specified criteria, the statute includes a nonexhaustive list of relevant factors for the court to consider. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

"Effective January 1, 2024, Senate Bill 545 amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) The previous version of the statute made consideration of those factors discretionary, not mandatory. (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) With respect to the degree of criminal sophistication, Senate Bill 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking, sexual abuse, or sexual battery.' (§ 707, subd. (a)(3)(A)(ii).)" (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.)

We review the juvenile court's ruling on a transfer motion for abuse of discretion. (*In re J.S.* (2024) 105 Cal.App.5th 205, 211.) "'The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's "'erroneous understanding of

21

applicable law'" is subject to reversal.'" "[W]e do not reweigh the evidence and we do not substitute our discretion for the discretion exercised by the trial court." (*Ibid.*)

2. *The Juvenile Court Properly Applied Section 707*

M.P. contends the juvenile court did not properly apply section 707, as amended by Assembly Bill 2361, because it did not make a finding on amenability *independent* from the court's consideration of the five statutory criteria. He contends the plain language of the statute, the legislative history, and California Rules of Court,[6] rule 5.770 support his position that the juvenile court must treat amenability to rehabilitation as a "separate and distinct" factor under the new law.

Respondent counters that M.P. forfeited the issue by failing to raise it below, and in any event, that M.P.'s position lacks merit because it conflicts with the plain language of the statute and how every court, including this one, has interpreted it.

We agree with respondent that M.P. forfeited the issue by failing to raise it below. M.P.'s counsel at the transfer hearing did not assert the juvenile court needed to make a finding on amenability separate from its consideration of the five statutory criteria under section 707. He asserted that under Proposition 57, the court must consider the five statutory criteria and "engage in a totality analysis when determining the issue of transfer." Notwithstanding his argument below, M.P. contends this court should exercise its discretion to address the issue because it "raises a pure and important question of law" related to a statute that "has recently changed and is still being interpreted."

---

**6**      All further undesignated rule references are to the California Rules of Court.

An appellate court will ordinarily not consider a matter raised for the first time on appeal, although "whether to apply that rule is largely a question of the appellate court's discretion." (*Air Machine Com SRL v. Superior Court* (2010) 186 Cal.App.4th 414, 421, fn. 7.) "This is particularly true where the issues raised 'involve only questions of law based on undisputed facts.'" (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1311.) Because the issue M.P. raises presents a pure issue of law that involves the interpretation of a recently amended statute, we will exercise our discretion to address it.

"'As in any case involving statutory interpretation, our fundamental task … is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]' [Citation.] '"When the language of a statute is clear, we need go no further." [Citation.] But where a statute's terms are unclear or ambiguous, we may "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part."'" (*People v. Harrison* (2013) 57 Cal.4th 1211, 1221-1222.)

Under the plain language of section 707, subdivision (a)(3), the juvenile court must make a finding that the minor is not amenable to rehabilitation in the juvenile court before the court can order the minor transferred to adult criminal court. Assembly Bill 2361 specifically added this requirement to the statute. (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284 [amended section 707 now "require[s] a new specific finding regarding

amenability to rehabilitation"].) Since the passage of Assembly Bill 2361, appellate courts have consistently referred to a juvenile court's finding on amenability as the "ultimate" question for the juvenile court to decide at a transfer hearing. (See e.g., *In re J.S.*, *supra*, 105 Cal.App.5th at p. 212; *Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165; *In re S.S.*, *supra*, 89 Cal.App.5th at p. 1288; *In re E.P.*, *supra*, 89 Cal.App.5th at p. 416.) However, we do not find support for M.P.'s position that the juvenile court's finding on amenability must be "separate and distinct" from the court's consideration of the five statutory criteria.

Section 707, as amended by Assembly Bill 2361, requires the juvenile court to make a finding that "the minor is not amenable to rehabilitation." (§ 707, subd. (a)(3).) The very next sentence instructs that: "In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E) . . . ." (*Ibid.*) Thus, the language of the statute is clear and unambiguous that the juvenile court's finding that a minor is not amenable to rehabilitation should be based upon an evaluation of the five statutory criteria. As the ultimate finding the juvenile court is required to make, amenability to rehabilitation is necessarily informed by the court's consideration of the five statutory criteria and the statutorily identified relevant factors that apply to each criterion. (§ 707, subd. (a)(3)(A)-(E); *In re J.S.*, *supra*, 105 Cal.App.5th at p. 212.)

Our conclusion is consistent with the approach we took in *Miguel R.,* where we explained that under section 707, the juvenile court is required to consider each of the five statutory criteria; determine the extent to which each criteria suggests the minor may

be amenable to rehabilitation; and weigh the criteria in order to make an ultimate determination of whether, collectively, the factors show the minor is amenable to rehabilitation. (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 166-167; see *In re E.P.*, *supra*, 89 Cal.App.5th at pp. 416-417 [juvenile court's "ultimate finding" must be based on the court's analysis of "all five factors together"].) The change Assembly Bill 2461 made to section 707 was not to *separate* the court's ultimate finding on amenability from the five statutory criteria, but to "refocus" the juvenile court's assessment and require "[t]he analysis of the five criteria set forth in the statute [to] be focused through the lens of amenability to rehabilitation." (*In re S.S.*, *supra*, 89 Cal.App.5th at p. 1288.)

Thus, while we agree with M.P. that under the amended version of section 707, the juvenile court must make a specific finding on the minor's amenability to rehabilitation, we conclude that finding is the ultimate determination the juvenile court must make; a determination that is not "separate and distinct" from the court's consideration of the five statutory criteria, but one that is necessarily informed by the court's consideration of the statutory criteria. Indeed, it is the court's consideration of the statutory criteria—along with the statutorily identified relevant factors the court must consider as to each criterion—that provides the framework for the court to make a proper assessment of the minor's amenability to rehabilitation, ensuring that the court broadly considers the totality of the minor's circumstances in making a transfer decision.[7]

---

[7] While we need not go beyond the express, unambiguous language of the statute, neither rule 5.770, nor the legislative history information M.P. cites persuade us to adopt M.P.'s position. Consistent with the amended version of section 707, these materials

25

It also bears noting that the very factors M.P. contends the court should have separately considered in an amenability finding are all factors the court was statutorily required to consider in its assessment of the five statutory criteria, including M.P.'s history of family trauma and physical abuse, his removal from the home, his multiple diagnoses, lack of support from the probation department, and the recent death of his brothers. (§ 707, subd. (a)(3)(A)(ii) [the court "shall" consider "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; … the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system"]; § 707, subd. (a)(3)(C)(ii) [the court "shall" consider "the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior"]; § 707, subd. (a)(3)(D)(ii) [the court "shall" consider "the adequacy of the services previously provided to address the minor's needs"].) Thus, even if we were to agree with M.P. that the juvenile court was required to make a finding on amenability "separate and distinct" from its consideration of the five statutory criteria, we fail to see how M.P. could have been prejudiced. The juvenile court

simply provide that the juvenile court must make a finding on amenability before transferring a minor to adult criminal court; they do not suggest that the finding should not be informed by the court's consideration of the five statutory criteria. (See e.g., rule 5.770(b)(3); Assem. Com. on Pub. Saf. Analysis of Assem. Bill No. 2361 (2022 Reg. Sess.) at p. 7 ["This bill does not eliminate the requirement that the court weigh the five factors. This bill would further require that the court find that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court in order to transfer the minor to a court of criminal jurisdiction"].)

considered the very factors M.P. contends it should have considered in its amenability assessment, and having considered those factors, the court found based on the totality of the circumstances that M.P. was not amenable to rehabilitation.

In sum, the juvenile court properly applied the amended version of section 707. It thoroughly analyzed each of the five statutory criteria and the statutorily identified relevant factors, and then "based on an evaluation of all of the criteria and factors and based on the totality of the circumstances" made the ultimate finding by clear and convincing evidence that M.P. "is not suitable for and is not amenable to rehabilitation under the jurisdiction of the juvenile court and cannot be rehabilitated within the jurisdiction of the juvenile court system." This was exactly what it was required to do. Accordingly, we find no error in the court's application of section 707.

3. *Substantial Evidence Supports the Juvenile Court's Transfer Order*

Alternatively, M.P. argues there was not sufficient evidence to support the juvenile court's transfer order. M.P. challenges all four of the statutory criteria the juvenile court found weighed in favor of transfer. Respondent counters there was sufficient evidence to support the transfer order. We agree with respondent.

A. *Criminal Sophistication*

The first statutory criterion is "[t]he degree of criminal sophistication exhibited by the minor." (§ 707, subd. (a)(3)(A)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time

of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication."  (§ 707, subd. (a)(3)(A)(ii).)

    i.   *Reasoning in the Transfer Order*

In assessing this criterion, the juvenile court adopted the analysis and reasoning of the initial transfer order, then went on to address the additional evidence presented at the second transfer hearing.

The court described the underlying offense as a "carefully planned armed robbery" where the victims were "cruelly ambushed during a marijuana drug transaction."  The court noted M.P. was 17 years old at the time of the offense and had access to and a readiness to use a firearm.  He committed the robbery with other participants, including a gang member, and assigned each participant a particular role.  He was known to carry a firearm according to his girlfriend, and the firearm used in the underlying incident had the serial number removed.  As to his gang involvement, the court noted M.P. previously claimed to have been part of the "Desert Town" gang since age 14, although he told Dr. Rogers he joined the gang at age 16 and disaffiliated at age 18.  The court found M.P. was not truthful about having renounced the gang based on his involvement in several group assaults while detained in the county jail, and a jail photo showing M.P. with a

large "D" tattoo on his chest—a tattoo he did not have while he was detained in juvenile hall.

The court noted it had previously (in the initial transfer order) considered the evaluations of Dr. Jones, Dr. Suiter, and Dr. Bosch, all of which discussed M.P.'s background, mental health diagnoses, and traumatic events in his childhood. The court then went on to summarize Dr. Rogers' evaluation. Dr. Rogers' primary diagnostic impression of M.P. was "other specified disruptive, impulse-control, and conduct disorder." She noted that he historically had difficulty controlling his emotions and behaviors. He also presented with "other specified trauma and stressor related disorder" based on the trauma he experienced growing up, including violence and substance use in the home, being removed from his mother's care for a year, and experiencing the death of his two brothers in February 2023. Dr. Rogers concluded M.P.'s traumatic childhood experiences led to emotional difficulties, significant alterations in arousal and reactivity such as hypervigilance, and increased substance use. Dr. Rogers further found M.P. met the criteria for cannabis use disorder, in sustained remission, in a controlled environment. The court noted that Dr. Rogers expressed the opinion that M.P. could be rehabilitated within the juvenile court's jurisdiction, although she acknowledged she was missing some information regarding M.P.'s recent conduct—including the jail assaults and that he had been charged with a felony offense committed while in jail.

The court concluded: "The court has considered numerous factors from [M.P.'s] upbringing which include lack of parental guidance, physical abuse, exposure to IPV

29

[interpersonal violence], CPS referral, and placement in foster care, physical suffering and witnessing violence (including death) in the community. The court does not minimize the traumas [M.P.] has experienced. The court has weighed this testimony and evidence and taken it into consideration these factors and concludes this does not reduce [M.P.'s] criminal sophistication. Despite the additional evidence and testimony by Dr. Rogers at the re-hearing, when the court takes into consideration the entirety of the record, 'the whole picture' the court does find [M.P.] to be criminally sophisticated."

ii. *Analysis*

M.P. contends the court improperly relied on the circumstances of the offense and ignored the science surrounding children's brain development and their inability to make sophisticated choices. M.P. emphasizes that not only did he suffer extreme trauma in his childhood, his varied psychological diagnoses added to his inability to make sophisticated choices, which the juvenile court peripherally acknowledged but ultimately ignored. M.P. contends his actions were not those of a sophisticated criminal. Rather, "they showed signs of an impulsive, reactive young man who had the terrible idea of stealing from a drug dealer that went bad."

Section 707, subdivision (a)(3)(A)(ii), allows the juvenile court to "give weight to any relevant factor" when considering this criterion. To the extent the circumstances of the offense reflect on a minor's criminal sophistication, the court may take that into consideration. "The criminal-sophistication criterion 'requires a juvenile court … to consider the whole picture, that is, all the evidence that might bear on the minor's

30

criminal sophistication, including any criminal sophistication manifested in the present crime.'" (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 192 (*Kevin P.*); *People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 683-684.)

The juvenile court properly considered the "'"whole picture"'" when evaluating M.P.'s criminal sophistication. The court did not ignore M.P.'s childhood trauma. It described and expressly considered M.P.'s upbringing, including the lack of parental guidance, physical abuse, exposure to interpersonal violence, the CPS referral and placement in foster care, and his witnessing violence and death in the community. The court also described and expressly considered M.P.'s multiple diagnoses, as set forth in Dr. Rogers' report. The court may not have placed as much weight on these factors as M.P. would have liked, but we have no reason to doubt that the court sincerely considered this evidence.

In *In re J.S.* the minor raised a similar claim that the juvenile court did not acknowledge evidence of the minor's childhood trauma or his therapeutic growth while in custody. (*In re J.S.*, *supra*, 105 Cal.App.5th at p. 214.) *In re J.S.* rejected the argument because the juvenile court expressly stated in its written ruling that it had considered the evidence the minor claimed the court had not considered, and the evidence in the record supported the court's finding. (*Ibid.*) Similarly here, the court specifically stated it considered the evidence of M.P.'s childhood trauma, including his diagnoses, but it concluded that evidence did not mitigate the evidence reflecting criminal sophistication, and the record supports such a finding.

31

M.P.'s access to firearms, his willingness to use them, the leadership role he took in planning and effectuating the offense, and his continued gang involvement since he was taken into custody all reflect criminal sophistication. M.P. was the instigating force behind the underlying offense. He came up with the plan to rob the marijuana dealer and assigned specific roles to his coparticipants, including directing Angel to shine a flashlight into the car, making it more difficult for the victims to see them. (See *In re J.S.*, *supra*, 105 Cal.App.5th at p. 214 [planning ahead to commit a crime is indicative of criminal sophistication].)

Substantial evidence thus supports the juvenile court's conclusion that M.P.'s childhood trauma, though not insignificant, does not reduce his level of criminal sophistication.

B. *Rehabilitation Prior to the Expiration of the Juvenile Court's Jurisdiction*

The second statutory criterion is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)

i. *Reasoning in the Transfer Order*

As with the first criterion, the juvenile court adopted the analysis and reasoning of the initial transfer order in full, then went on to assess the additional evidence presented at the second transfer hearing.

In the initial transfer order, the court noted M.P.'s conduct in juvenile had overall been exemplary, although there had been some conduct and rule violations. The court expressed concern that M.P. had not renounced his gang activity and noted he was involved in a six on one attack over gang politics while at juvenile hall. The court noted the three psychological evaluations suggested a pessimistic outlook for effective rehabilitation, and in particular Dr. Bosch noted M.P. is likely to be involved with high risk-taking activities, impulsivity, and irresponsibility; he appeared to be less bound by moral restraints than other people and showed a callous disregard for others; and showed traits that would tend to support he has a very negative opinion about mental health professionals, an unwillingness to self-disclose. and beliefs that his problems are unsolvable. Finally, the court noted M.P. exhibited symptoms of conduct disorder and therefore may be difficult to treat.

The juvenile court adopted this reasoning and went on to note that M.P. was eligible for Pathways to Success and would receive approximately four and a half years of treatment before aging out of the juvenile system. The court noted, however, that timeframe may be impacted by M.P.'s pending felony assault charge. The court further noted that M.P. had been involved in four[8] assaultive incidents in the jail, all of which involved multiple inmates, and one of which resulted in the pending felony charge. The court noted that Dr. Rogers was not aware of these incidents when she wrote her report,

---

[8] The record reflects M.P. was involved in five assaults while in custody at the jail. Those assaults occurred on January 14, 2022, August 30, 2022, September 7, 2022, April 4, 2023, and October 18, 2023.

33

and she testified that she would need more information to assess whether M.P.'s assaultive conduct was attributable to the culture in jail.

The court concluded, "The court has considered the information contained in the original psychological evaluations, the previous psychological testing conducted, and has considered the additional information presented in the re-hearing. The court does not find [M.P.] amenable to the services and treatment still available under the juvenile court's jurisdiction."

ii. *Analysis*

M.P. contends there was not substantial evidence to support the court's finding on this criterion because Dr. Rogers, Dr. Jones, and the probation officer all concluded M.P. could be rehabilitated in the juvenile justice system, and the prosecution did not provide any expert testimony to the contrary. Citing *In re S.S.,* M.P. asserts that "proper analysis of this criterion generally requires 'expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.'" (*In re S.S.*, *supra*, 89 Cal.App.5th at p. 1291; *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 722 (*J.N.*).)

We agree that expert testimony is generally required for the juvenile court to appropriately assess this criterion, but unlike *In re S.S.* and *J.N.*, the juvenile court had the expert testimony and evidence it needed to fairly assess this criterion. In *J.N.*, there was no expert testimony, only the opinion of a probation officer, who concluded the minor could not be rehabilitated in the juvenile system. (*J.N.*, *supra*, 23 Cal.App.5th at

34

pp. 721-722.)  In *In re S.S.*, there was a single psychological expert who identified a number of counseling and treatment programs the minor would benefit from but did not give an opinion on whether the minor could be rehabilitated in the juvenile system.  (*In re S.S.*, *supra*, 89 Cal.App.5th at p. 1283.)  Here, in contrast, the probation officer's informational update addressed the programs available to M.P. at Pathways to Success and the amount of time that M.P. had remaining in the juvenile justice system.  There was also expert testimony from four different psychologists, two of whom addressed whether M.P. was amenable to rehabilitation in the juvenile system.  The psychologists also addressed aspects of M.P.'s circumstances that would make his amenability to rehabilitation more challenging.  Thus, the evidence needed for the juvenile court to fairly assess this criterion was before the court.

M.P. contends there was not substantial evidence to support the court's finding on this criterion because the probation officer, Dr. Jones, and Dr. Rogers, all testified M.P. was amenable to treatment in the juvenile system.  M.P. asserts, that "[s]ince the dispositive question [at the transfer hearing] is the minor's amenability to treatment through the facilities available to the juvenile court, testimony of experts that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination." (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714-715.)  However, *Jimmy H.* went on to state that the ultimate decision "rests in the sound discretion of the juvenile court." (*Id*. at p. 715.)  The juvenile court is required to consider the experts' opinions, but it is not bound by them.  (*In re J.S.* (2024) 105 Cal.App.5th 205, 212; see *In*

35

*re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 [the fact that the court's finding conflicted with two experts' opinions did not show a lack of substantial evidence because the court is not obligated to adopt the experts' opinions].)

Here, the record reflects the court took the experts' opinion into consideration in conjunction with the rest of the evidence bearing on this criterion, as it was required to do. (§ 707, subd. (a)(3)(B)(ii).)

As M.P. notes, Dr. Rogers and Dr. Jones both concluded M.P. was amenable to rehabilitation in the juvenile system. However, Dr. Jones' conclusion was contingent upon M.P.'s continued abstention from drug and alcohol usage,[9] and Dr. Bosch noted that M.P. was in denial that his daily use of marijuana made him an addict. Dr. Bosh testified, "[i]f a person is in denial about an addiction, it makes them less amenable to treatment." Dr. Bosch and Dr. Suiter did not give an opinion on whether M.P. was amenable to rehabilitation in the juvenile system, but they did address aspects of M.P.'s circumstances that would make his amenability to rehabilitation more challenging. Dr. Bosch and Dr. Suiter both determined M.P. suffered from ADHD, a conduct disorder, and a substance abuse disorder, which was in institutional remission.[10] Dr. Suiter stated the combination of ADHD and conduct disorder "make[s] a favorable treatment outcome

---

[9]     Dr. Jones concluded "treatment . . . could result in substantially improved functioning by age 25 or sooner . . . . [M.P.] would be unlikely to present much of a risk to the safety of the community if he continues to participate in treatment and abstain from drug and alcohol usage."

[10]     Dr. Bosch concluded M.P. suffered from conduct disorder, while Dr. Suiter concluded it was other specified disruptive, impulse-control, and conduct disorder.

more difficult." Dr. Bosch concluded that "[i]f he should enter [placement] with this same mindset tied to a gang and gang lifestyle mentality, then the prognosis for [M.P.] is poor."

The record reflects that not only had M.P. not renounced his gang ties, he had been involved in five additional group assaults at the jail, one of which resulted in a felony charge. The juvenile court found M.P.'s continued assaultive conduct "concerning" and noted that Dr. Rogers was not aware of the assaults when she wrote her report. Nor we note, was Dr. Suiter aware of M.P.'s continued assaultive conduct, as it occurred after the initial transfer hearing.

Substantial evidence thus supports the juvenile court's finding on this criterion. At the time of the transfer hearing, M.P. had only four and a half years remaining before he ages out of the juvenile system—a timeframe the juvenile court noted could be impacted by his pending felony assault charge. The assessments of Dr. Suiter and Dr. Bosch in conjunction with M.P.'s continued gang involvement and assaultive conduct support the juvenile court's finding that M.P. could not be rehabilitated prior to the expiration of the juvenile court's jurisdiction.

C. *Previous Delinquent History*

The third statutory criteria is "[t]he minor's previous delinquent history." (§ 707, subd. (a)(3)(C)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community

environment and childhood trauma on the minor's previous delinquent behavior."
(§ 707, subd. (a)(3)(C)(ii).)  Previous delinquent history has been interpreted to mean previous to the transfer hearing, so the juvenile court may properly consider conduct the minor engaged in after the offense, but before the transfer hearing.  (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 451–456.)

      i.  *Reasoning in the Transfer Order*

The initial transfer order concluded this criterion weighed against transfer.  The court noted M.P. only had one prior petition in the juvenile court, although there was some indication that he was engaged in other nonreported delinquent activity based on his school history and Desirae's statement that he was often in possession of a firearm.  The court also considered M.P.'s previously noted childhood trauma and concluded based on a totality of the circumstances that this factor mitigated against transfer.

The juvenile court adopted the facts but not the reasoning and analysis in the initial transfer order because M.P. had engaged in additional delinquent conduct since the initial transfer hearing.  The court considered the additional facts that M.P. had a pending felony assault charge, and had been involved in three additional assaultive incidents, each of which he was determined to be an aggressor.  The court found M.P.'s continued assaultive actions in jail "troubling and a cause for concern."  The court also considered M.P.'s "childhood trauma that was previously noted, as well as his family environment in regard to this factor."

The court concluded, "Applying the higher burden of proof with respect to this criterion after considering the additional information presented in the re-hearing the court concludes [M.P.] is not amenable to rehabilitation under the jurisdiction of the juvenile court."

ii. *Analysis*

M.P. contends there was not substantial evidence to support this criterion because the court focused solely on M.P.'s delinquent history, but gave little consideration to the effect M.P.'s family and community environment and childhood trauma had on his behavior.

We reject this argument. The court specifically stated it "considered [M.P.'s] childhood trauma that was previously noted, as well as his family environment in regard to this factor." As with the first criterion, we have no reason to doubt that the court sincerely considered M.P.'s childhood trauma and family environment when evaluating this criterion.

The court also took into consideration the fact that since the last transfer hearing M.P. had been involved in several group assaults and was facing a felony assault charge. M.P. contends his conduct showed that he was struggling while in adult custody and needed support, services, and intervention. This is one way to interpret M.P.'s conduct. The other way, consistent with the juvenile court's assessment, was that M.P. was continuing to live as he did before he was taken into custody—by associating with gang members and engaging in criminal conduct.

39

Substantial evidence thus supports the juvenile court's finding on this criterion. Notwithstanding M.P.'s childhood trauma, his delinquent history—including his prior offense for possession of a loaded firearm and the six different group assaults he was involved in while in custody (one in juvenile hall and five in jail)—show that he was not amenable to rehabilitation in the juvenile system.

D. *Success of Previous Attempts to Rehabilitate the Minor*

The fourth statutory criterion is the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor." (§ 707, subd. (a)(3)(D)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707, subd. (a)(3)(D)(ii).)

The juvenile court found this criterion did not support transfer because the four months M.P. was on probation before he committed the instant offense was during the Covid-19 pandemic, at a time when the probation department was not providing the same level of services they were providing before the lockdown.

E. *Circumstances and Gravity of the Offense*

The final statutory criterion is "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(E)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually

caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

### i. *Reasoning in the Transfer Order*

In assessing this criterion, the juvenile court adopted the analysis and reasoning of the initial transfer order along with much of its own factual analysis and reasoning set forth under the first criterion. The court found M.P. was the primary actor in the underlying offense and that there was no competent evidence he was pressured to act. He planned to rob a marijuana dealer and he discharged a firearm during the offense as the victims attempted to drive away. Additionally, his coparticipant was a gang member, although the offense was not gang-related. The court noted that as a result of M.P.'s conduct, one victim died, another was grazed with a bullet, and the third victim's vehicle was damaged by gunfire. The court stated it "cannot contemplate circumstances more serious and more grave than what occurred in this offense. [M.P.] fired his gun multiple times during a planned robbery as the victims tried to drive away." The court noted it relied on the psychological reports and the testimony of the doctors, including at the re-hearing and the background information in the probation officer's report. The court concluded, "[h]aving taken into consideration [M.P.'s] background, the court finds it is insufficient to mitigate the circumstances of the gravity of the offense in this case."

### ii. *Analysis*

M.P. contends this criterion is arguably the least helpful criterion because the minor—like any person accused of a crime—is presumed innocent, and the primary issue

41

at a transfer hearing is not whether the minor committed a specific act, but whether he or she is amenable to rehabilitation. M.P. further asserts the police reports and probation officer's report relied on "information and statements from two self-serving, unreliable sources," Angel and Desirae. He states that he does not seek to diminish the seriousness of the crime, but "given the limited evidence … regarding the circumstances of the shooting and M.P.'s actual involvement in it" the evidence does not substantially support a finding that M.P. is not amenable to treatment in the juvenile court.

The final criterion, the circumstances and gravity of the offense, "focuses on the offense '"*alleged in the petition*"'" [citation], and like the other statutory criteria, it is 'based on the premise that the minor did, in fact, commit the offense.'" (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 189; *People v. Superior Court* (*Jones*), *supra*, 18 Cal.4th at p. 682.) We therefore reject M.P.'s challenge to his involvement in the offense. However, "the allegation that a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.' [Citations.] Rather, in evaluating this criterion, a juvenile court may rely on evidence that, 'while not justifying or excusing the crime, tends to lessen its magnitude' [citation], 'including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development.'" (*Kevin P.*, at p. 189.)

As the juvenile court noted, M.P. was the instigating force behind the robbery. He planned the robbery in advance and fired multiple shots at the victims as they attempted

to drive away.  As a result of his conduct, one victim died, another was grazed with a bullet, and the third victim's vehicle was damaged by gunfire.  Substantial evidence thus supports the juvenile court's finding that evidence of M.P.'s childhood trauma and mental health diagnoses was insufficient to mitigate the circumstances of the gravity of the offense in this case.

F.  *Ultimate Finding*

Having considered each of the five statutory criteria as set forth above, the juvenile court made its ultimate finding "based on an evaluation of all of the criteria and factors and based on the totality of the circumstances as presented."  The court went on to conclude, "for all of the reasons stated in the *original transfer decision* and the decision herein, the court finds that [M.P.] is not amenable to rehabilitation while under the jurisdiction of the juvenile court."

The juvenile court's detailed and thorough review of the statutory criteria and the applicable evidence support its ultimate finding that M.P. was not amenable to rehabilitation in the juvenile system.  The court took into account the trauma M.P. suffered in the past, his diagnoses, and the limited services he was provided during the Covid-19 pandemic.  It balanced those facts against the fact that M.P. is facing a charge of homicide, he has not renounced his gang affiliation, he has continued to participate in group assaultive attacks, has a felony criminal charge pending, and there is little time left to attempt to rehabilitate him under the juvenile court's jurisdiction.

G. *Conclusion*

We therefore conclude the juvenile court did not abuse its discretion by transferring M.P. to criminal court. Substantial evidence supports the juvenile court's findings on each of the five statutory criteria and its ultimate finding that M.P. was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

## DISPOSITION

We affirm the juvenile court's order transferring M.P. to a court of criminal jurisdiction.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

McKINSTER

J.

CODRINGTON

J.