Filed 4/11/25  P. v. Quinonez CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC STEVEN QUINONEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B331555<br>(Super. Ct. No. 2022002605)<br>(Ventura County) |

Eric Steven Quinonez appeals from the judgment after a jury convicted him of felony theft from an elder (Pen. Code, § 368, subd. (d)(1)), misdemeanor elder abuse (*id.*, subd. (c)), and misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).  The trial court imposed a split sentence of three years: one year in county jail, followed by two years of mandatory supervision.  Eric[1] contends: (1) the judgment should be reversed because the court admitted improper opinion

---

[1] Because the defendant and victim in this case share a last name, we refer to them by first name.  No disrespect is intended.

testimony, and (2) the minute order from sentencing and abstract of judgment must be corrected. We order correction of the challenged minute order and abstract of judgment, and otherwise affirm.

FACTUAL AND PROCEDURAL HISTORY

*The underlying crimes*

In early 2022, Ellen Quinonez was staying with her son Eric at a Ventura motel. She was 78 years old at the time. On February 1, Ellen went to the bank to withdraw money to pay for the motel room. When she got back, she took a nap. The money she had withdrawn was with her in the room.

Around 7 p.m. Ellen called 911. She told the dispatcher that Eric had taken her money and her rental car. She also said that Eric had been abusing her "for the last two weeks."

Ventura Police Officer Monica Phinney responded to Ellen's 911 call an hour later. Ellen appeared upset, confused, and "stressed out" when Phinney arrived at the motel.[2] She told the officer that she saw Eric rifling through her purse when she woke from her nap. She tried to grab him but he "pushed" her and "took off" in her rental car with nearly $1,700 of her money. Phinney did not notice any injuries to Ellen, but Ellen said she was experiencing wrist pain.

Eric returned to the motel while Phinney was speaking with Ellen. At some point the officer retrieved $1,214 from Eric's pocket. Eric said that Ellen had given him all that money "except for like $45." Ellen later asked for the money back, but Eric wanted to hold onto it until he could speak with police.

---

[2] Ellen told Phinney she had drunk a glass of wine prior to her arrival, but the officer suspected that Ellen had consumed more than that.

Eric told Phinney that he did not spend any of Ellen's money. He also said he did not push her. After he was arrested he told another officer that the money in his pocket belonged to Ellen.[3]

*Trial*

At trial Ellen testified that she had told Eric that he could take money whenever he needed. She denied that Eric had taken money from her motel room and denied that he pushed her. She said she would sometimes "say anything" and that she didn't always mean what she said. She "dr[a]nk chardonnay to sleep."

After Ellen's testimony prosecutors moved to admit expert witness testimony on domestic violence and elder abuse. They proffered district attorney investigator Yumira Kirk as their witness on these topics.

At an Evidence Code[4] section 402 hearing, Kirk said she worked as a civilian for the Los Angeles Police Department for four years, then spent 10 years as a police officer in Santa Barbara. Some of the cases she investigated involved domestic violence or elder abuse. Her six months in the police academy included training on domestic violence, as did her nine months of field training. She later took courses on the subject. She had testified in five jury trials and more than 40 preliminary hearings that involved domestic violence.

Eric objected to Kirk's qualifications as an expert witness. The trial court conceded that Kirk's "credentials fall far short of

---

[3] When Eric arrived at jail, a bag containing a crystalline substance fell out of his shorts. He admitted that the substance was methamphetamine.

[4] Unlabeled statutory references are to the Evidence Code.

3

what [it was] used to seeing," but concluded that "the bar for admissibility is low" and permitted her to testify. Any concerns about Kirk's credentials went to the weight of her testimony, not its admissibility.

When trial resumed, Kirk testified that a theme she noticed in domestic violence cases was that complaining witnesses often "want to recant their statements or change their statements in a way that they could have it not look as bad, [and] minimize what occurred." Sometimes victims of elder abuse did the same thing; Kirk saw "patterns" of victims doing so when she worked in Santa Barbara. Factors that contributed to this minimization included the "cycle of violence" that occurs in domestic abuse, the roles of power and control, the significance of isolation in elder abuse cases, the use of victim blaming, and the significance of cognitive decline in many elders.

Kirk additionally testified that she had been trained in "evaluating whether someone's statement is truthful." When evaluating whether a 911 caller was truthful, for example, she considered the caller's "tone of voice, [their] sense of urgency, [and] the amount of speed in which they speak." She said "[n]obody ever just calls 911, you know, just because. If that does happen, it's extremely rare. Most people who call are in need of help immediately."

> "[E]ach situation will call for something different. It just depends on the situation, and it also depends a lot on the person. People have various different ticks. Whether that means—what I mean by ticks is truth telling. So some people will tell the truth, sometimes they will tug their ear when they say a truth, or sometimes they'll do the opposite where they might, you know, if they're lying, they might lie and then

4

look down.  So these are all just some indicators, but ultimately those are just indicators.

"I have to take the totality of everything that goes into if they're telling the truth, whether the statement is making sense, is there evidence to corroborate that?  Was there a 911 call or a witness or a neighbor?  All these things go into play if someone is telling the truth."

Kirk concluded that a person's motivations to lie are relevant to evaluating their truthfulness.  "[D]ependency" can be too, because if a victim is dependent on their abuser "they don't want to lose that sustainability."  She downplayed the effect of alcohol on truthfulness, however: "Just because [a person is] under the influence of alcohol doesn't mean they're not telling the truth."

Eric testified in his own defense.  He said that he paid for the motel room with his credit card when he and Ellen checked in.  He did not stay in the room full time but went there "several days a week."  His mother was "very unusual to live with" and repeatedly came home with large sums of cash.  On February 1, 2022, he discovered that Ellen had withdrawn all the money from her checking account.  Upon making this discovery he called "Sergeant Kelly" from the Ventura Police Department to express concern about what his mother had done.  He had also called the manager of Ellen's bank.

Eric said that he was on his way to the bank to put Ellen's money back into her account when she called 911.  He agreed that he got to the bank "a little bit too late," and admitted that the bank was closed by the time that 911 call took place.

Eric said that there was a "fake FBI guy" at the motel when he returned from the bank, "sweet talking" Ellen into helping

5

him get a room. Eric threw the man out of Ellen's room and got into a "big fistfight" with him a few blocks away. When Eric returned to the motel he "put the money on top of the bed" and asked Phinney to detain the man he had been fighting. Phinney ordered him to put the money back in his pocket, and he did. He did not push Ellen that day, and had never done so.

On rebuttal, Sergeant Craig Kelly testified that he did not know Eric and did not receive a call or a voicemail from him in February 2022. He had never provided Eric with his personal cell phone number.

*Sentencing*

After a jury convicted Eric of theft from an elder, elder abuse, and possession of methamphetamine, the trial court sentenced him to one year in county jail and two years of mandatory supervision. The court made no mention of imposing fines or fees related to domestic violence during sentencing, and made no finding that Eric has a history of drug abuse.

The minute order from sentencing states that Eric must pay $500 to the State Domestic Violence Fund and $300 to Ventura County women's shelters. The order also states that Eric "has a history of drug abuse" and "recommends that [he] participate in a counseling or educational program." The abstract of judgment states that Eric is to participate in such a program and that he must pay $500 to the domestic violence fund.

DISCUSSION

*Kirk's testimony*

Eric contends the trial court should not have permitted Kirk to testify as an expert on domestic violence and elder abuse because she lacked the requisite qualifications. We disagree.

A witness is qualified to proffer expert testimony if they

6

have "special knowledge, skill, experience, training, or education sufficient to qualify [them] as an expert on the subject to which [their] testimony relates." (§ 720, subd. (a).) "Whether a [witness] qualifies as an expert in a particular case depends on the facts of that case and the witness'[s] qualifications." (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39 (*Sergill*).) A trial court has "considerable latitude in determining" whether a witness has the requisite qualifications, and we will uphold that determination "unless a manifest abuse of discretion is shown." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357.) A manifest abuse of discretion is shown only if " ' " 'the evidence shows that [the] witness clearly lacks qualification as an expert.' " ' " (*People v. Dowl* (2013) 57 Cal.4th 1079, 1089, italics omitted.)

Eric has not shown a manifest abuse of discretion here. At the section 402 hearing Kirk explained that she had training on domestic violence at the police academy, in the field, and through subsequent coursework. Many of the cases she investigated as a police officer involved domestic violence or elder abuse. She had testified about domestic violence in five jury trials and more than 40 nonjury proceedings. Such experience does not show a clear lack of the requisite qualifications.

Eric further contends Kirk's testimony about the "themes" she observed in domestic violence cases was inadmissible character evidence, and that her testimony on the methods she uses to determine a person's "truthfulness" invaded the province of the jury. But Eric did not object to Kirk's testimony during the proceedings below. His contentions are forfeited. (*People v. Stevens* (2015) 62 Cal.4th 325, 333; see § 353, subd. (a).)

Anticipating as much, Eric maintains counsel rendered ineffective assistance by failing to object to Kirk's testimony.

7

Establishing a claim of ineffective assistance of counsel requires Eric to demonstrate that counsel's performance was deficient and that he suffered prejudice as a result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692; *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).)  To demonstrate deficient performance Eric must show that counsel's performance fell below an objective standard of reasonableness.  (*Mickel*, at p. 198.)  To demonstrate prejudice Eric must show a reasonable probability that but for counsel's deficient performance the outcome of trial would have been different.  (*Ibid.*)  His ineffective assistance claim fails upon a defective showing of either component.  (*People v. Holt* (1997) 15 Cal.4th 619, 703 (*Holt*).)

Ineffective assistance of counsel claims are difficult to prove on direct appeal.  (*Mickel*, *supra*, 2 Cal.5th at p. 198.)  "The record on appeal may not explain why counsel chose to act as [they] did."  (*Ibid.*)  "Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable."  (*Ibid.*)  Moreover, appellate courts presume that counsel's actions fall within the broad range of reasonableness, and we afford great deference to counsel's tactical decisions.  (*Ibid.*)  For this reason, we will reverse a conviction for ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had no rational purpose for their acts or omissions.  (*Ibid.*)  Deciding whether to object to testimony is inherently tactical, thus a failure to object will rarely establish an ineffective-assistance claim.  (*People v. Romero and Self* (2015) 62 Cal.4th 1, 25.)

On this record we cannot conclude that Eric has carried his

burden of showing that counsel performed deficiently. Perhaps counsel deemed Kirk's testimony on Ellen's minimization of Eric's actions admissible, and thus chose not to make an unmeritorious objection. (*People v. Brown* (2004) 33 Cal.4th 892, 906-908 [expert testimony on recantation and minimization may be admissible]; *People v. Price* (1991) 1 Cal.4th 324, 387 [counsel not required to make unmeritorious objections].) Or perhaps counsel did not want to highlight Ellen's testimony by objecting. (*People v. Wharton* (1991) 53 Cal.3d 522, 567 (*Wharton*) [counsel not required to highlight adverse testimony].) Such tactical decisions fall within the broad range of reasonableness.

We reach the same conclusion with respect to the lack of objection to Kirk's description of the methods she uses to determine whether a person is being truthful—though we note that *had* counsel objected to this line of testimony the objection likely would have had merit. (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162, 179-180 [expert should not vouch for alleged victim's honesty]; *Sergill, supra*, 138 Cal.App.3d at p. 39 ["the veracity of those who report crimes to the police is [not] a matter sufficiently beyond common experience to require the testimony of an expert"].) But counsel may have wanted to avoid focusing the jury's attention to Kirk's testimony on this topic. (*Wharton, supra*, 53 Cal.3d at p. 567; see also *People v. Catlin* (2001) 26 Cal.4th 81, 165 [decision whether to object "highly tactical" and depends on whether objection "would serve only to highlight the undesirable testimony"].) Or "[c]ounsel may have figured counterargument held more rhetorical promise than a mere objection." (*People v. Ramirez* (2019) 40 Cal.App.5th 305, 311.) Or perhaps jurors "looked bored, and the stimulus of an objection may have awakened [their] interest[s] in a counterproductive

way."  (*Ibid*.)  Or given the evidence of Ellen's alcohol use, counsel could have concluded that objecting to Kirk's testimony would have "had no meaningful impact."  (*People v. Arredondo* (2019) 8 Cal.5th 694, 712.)  On this record, we simply cannot conclude that counsel performed deficiently.  Because Eric has not set forth affirmative evidence that counsel had no tactical purpose for his actions, his ineffective assistance of counsel claim fails.  (*Holt*, *supra*, 15 Cal.4th at pp. 703-704.)

*The abstract of judgment and minute order from sentencing*

Eric contends, and the Attorney General concedes, fines and findings not included in the trial court's oral pronouncement of judgment should be stricken from the sentencing minute order and abstract of judgment.  We agree.

"In a criminal case . . . the oral pronouncement of sentence . . . constitutes the judgment."  (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324, italics omitted.)  If there is a discrepancy between the pronouncement of judgment and a minute order or abstract of judgment, the pronouncement controls.  (*People v. Morales* (2014) 224 Cal.App.4th 1587, 1594.)  Because the requirements that Eric pay $500 to the domestic violence fund and $300 to local women's shelters were not included in the pronouncement of judgment here, they must be stricken from the August 7, 2023, minute order.  The finding that Eric has a history of drug abuse and recommendation that he participate in a counseling or education program must be stricken from that minute order for the same reason.  The requirement that Eric participate in such a program must also be stricken from the abstract of judgment, as must the requirement that he pay $500 to the domestic violence fund.

We also note that the abstract of judgment erroneously

10

states that Eric was convicted by plea. The amended abstract should reflect that Eric was convicted by jury.

DISPOSITION

The trial court is directed to prepare a corrected August 7, 2023, minute order and a corrected abstract of judgment, and forward a certified copy of the latter to the probation department. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:


YEGAN, Acting P. J.


CODY, J.

11

David R. Worley, Judge

Superior Court County of Ventura

_____

Alex Coolman and Kathy Moreno, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.